NOTE.—Reported in 102 N. E. 830. See, also, 38 Cyc. 1183; 14 Cyc. 1055.

---

SANDERSON ET AL. *v.* THE TRUMP MANUFACTURING COMPANY.

[No. 21,593.   Filed May 27, 1913.   Rehearing denied October 10, 1913.]

1. SALES.—*Warranty.—Collateral Agreement.*—A warranty in a sale of goods is not an essential element of the contract, but, although it may form a part thereof, is an independent agreement collateral thereto.   p. 218.

2. SALES.—*Breach of Warranty.—Burden of Proof.*—The buyer of goods has the burden of showing the existence of a warranty and its breach, regardless of whether he sues for the breach of warranty directly, or sets it up by way of set-off or counterclaim in an action against him for the purchase price.   p. 218.

3. SALES. — *Warranties. — Construction. — Machinery. — Tests.* — Where a contract for the installation of turbines in a hydroelectric plant indicated that it was the intention of the parties that the title should vest in the purchaser on delivery and there was nothing to indicate a possible intention to rescind the contract and return the turbines after they had been delivered, placed in position and tested, if they did not meet the stipulations of the contract as to development of power and efficiency of units, but clearly showed an intention to treat such stipulations as warranties, the fact that the specifications embraced in the contract reserved to the purchaser the right to test the turbines after installation with respect to development of power, etc., did not make the warranties conditions precedent requiring the seller to show performance in order to recover the purchase price.   p. 218.

4. SALES.—*Warranties.*—*Construction.*—*Conditions Precedent.*—A condition will not be treated as a condition precedent, where it appears from a consideration of the whole contract, its purpose, and the circumstances under which it was made, that the one party relied upon his remedy and not upon the other party's performance of such condition.   p. 219.

5. SALES.—*Delivery.*—*Acceptance of Part.*—*Conditions Precedent.* —*Warranties.*—Stipulations in a contract of sale that machinery for hydro-electric plant would develop a specified power, even if regarded as conditions precedent to the seller's right to recover, were changed in character by the buyer's act in accepting and permitting the installation of such machinery without objection, so as to preclude his right to insist on them as conditions precedent, and they are to be treated as warranties or independent agreements upon which the buyer may base a claim for damages in respect of any failure to develop the specified power.   p. 220.

6. SALES.—*Machinery.*—*Installation.*—*Acceptance.*—Where it appeared that, after having contracted for certain machinery to be installed in a hydro-electric plant which defendant was engaged to construct, and which machinery was to develop a specified power, the defendant received two units thereof, and, after same had been installed and found deficient in power, received and installed the remaining units, and the person for whom the plant was constructed dealt with such machinery as his own by mortgaging and transferring the same as an integral part of the plant, and such machinery remained in constant use for several years with no offer to return same, the acts of defendant and the owner of the plant were inconsistent with the claim that there had been no acceptance, and precluded defendant from relying on exact performance by plaintiff a condition precedent to recovery of the purchase price.   p. 220.

7. INTEREST.—*Right to Recover.*—*Sales.*—*Unpaid Portion of Price.*—Under §7952 Burns 1908, §5200 R. S. 1881, providing that money due on any instrument in writing shall bear interest at the rate of six per cent, as well as under the general rule that interest is recoverable as damages for the breach of a contract to pay money, where the amount and time of payment are certain, interest was recoverable on the balance due on a written contract for the sale of machinery at the statutory rate from the time when such unpaid portion was payable.   p. 221.

8. SALES.—*Price.*—*Time of Payment.*—*Certainty.*—A written contract for the sale of machinery, providing for payment half cash on receipt of the goods at destination, one-fourth in ninety days from date of shipment, and the balance six months from date of shipment, was not rendered uncertain as to time of payment by

the fact that a provision in the specifications reserved to the buyer the right to test the machinery after being put in commission, to determine its compliance with the warranty before final settlement. p. 222.

9. APPEAL.—*Review.—Findings and Conclusions.—Consideration of Cross Error.*—Where the findings and conclusions of law are favorable to appellee on the issues presented by a certain paragraph of answer, appellee's assignment of cross error on the action of the trial court in overruling a demurrer to such paragraph needs no consideration. p. 222.

10. SALES.—*Warranty.—Breach.—Duty of Buyer.—Burden of Proof.*—Involved in the burden resting upon the buyer to establish a warranty and its breach, is a duty of showing performance of all material conditions upon which the right to assert the warranty depends. p. 223.

11. SALES.—*Warranty.—Breach.—Duty of Buyer.*—Where defendant purchased certain machinery under a contract providing for installation by the buyer and reserving to him the right to test its power and efficiency with reference to the warranty after installation, defendant to establish a breach of such warranty was bound to show a proper installation and an efficient and accurate test, within a reasonable time, under actual working conditions, which demonstrated that the warranty had been broken. p. 224.

12. TRIAL.—*Special Findings.—Failure to Find Essential Fact.*—Where the facts are specially found, the failure to find an essential fact is equivalent to a finding against the party having the burden to establish the same. p. 224.

13. APPEAL.—*Review.—Special Findings.—Conclusions of Law.*—Only facts found within the issues can be considered in determining whether the special findings justify a conclusion of law rendered thereon. p. 225.

14. SALES.—*Warranty.—Breach.—Test of Machinery.—Findings.—Conclusions of Law.*—In an action for the price of machinery sold under contract that it would develop a certain power and efficiency, and providing for installation by the buyer and reserving to him the right to test same after installation to determine if the warranty as to power and efficiency had been complied with, a conclusion of law that defendant is entitled to damages for breach of such warranty is not supported by findings showing the installation of such machinery and a test of a part thereof, but which fail to show that the installation was of such character as to permit a proper demonstration of power and efficiency, and which fail to show that any tests were made of the character contemplated by the contract. p. 225.

15. SALES.—*Breach of Warranty.—Measure of Damages.—Ascer-*

*tainment.*—The measure of damages for a breach of the warranty as to the efficiency and power of certain machinery is the difference between the value of the machinery delivered and the value of such as would have complied with the warranty, and *prima facie* the contract price is the latter value, so that it was error to attempt to measure the damage by determining the percentage of deficiency and deducting the percentage thus ascertained from the contract price and cost of installation, not only of the machinery complained of, but also machinery as to which there was no controversy. p. 227.

From St. Joseph Circuit Court; *Walter A. Funk*, Judge.

Action by The Trump Manufacturing Company against Edwin N. Sanderson and others. From a judgment for plaintiff, the defendants appeal. *Reversed.*

*Marshall L. Howell, Demas D. Bates, Gilbert A. Elliott, Vitus G. Jones* and *John F. Devine,* for appellants.

*A. G. Graham, G. D. Crane* and *H. F. Wurzer,* for appellee.

Cox, J.—The St. Joseph and Elkhart Power Company was organized and incorporated in this State in 1900 for the purpose of building and maintaining a dam across the St. Joseph river east of Mishawaka, at a point known as Twin Branch, and erecting and maintaining in connection therewith a power house with hydraulic and electrical machinery for the purpose of generating and selling electrical current. Thereafter this company let the contract for all the work of construction to the Union Construction Company, a Connecticut corporation, which in turn sublet the work to appellants, engineers and contractors of New York City, doing business in the firm name of Sanderson and Porter. Appellants thereupon went into the open market to buy materials for building and equipping the dam and power house. They received from appellee, a corporation of Springfield, Ohio, engaged in the business of manufacturing water turbines, a written proposal to furnish certain described water wheels or turbines required in the equipment of the plant. Appellants met this proposal by a writing

denominated specifications for waterturbines. These writings with accompanying blue prints were mutually accepted and, it is agreed, became the contract between the parties on July 19, 1902. The contract was for two different classes of turbines known respectively as "exciter line turbines," and "generator line turbines". This controversy involves only the latter class. Five of these turbines were to be set on a horizontal shaft so attached that they would operate in unison to turn the shaft which was to be coupled to a generator to produce the electric current. Each set of five turbines so set on a single shaft was termed a unit. They were to be installed in the power house of the power company by appellants. Four of these units were ordered by appellants at different times and furnished by appellee under the contract and installed by appellants as received in the power house of the St. Joseph and Elkhart Power Company as the parties contemplated when the contract for them was made. Payments were made by appellants from time to time, when, claiming that the turbines had failed, in actual work, to produce the power and efficiency guaranteed by appellees, they refused to make further payments and this action was brought by appellee to recover the balance claimed to be due, with interest.

The complaint was in four paragraphs. The first declared on an oral contract. The second sought to recover the value of the machinery without reference to a contract. The second paragraph was taken out of the case by a voluntary dismissal by appellee. The first paragraph is not of importance as it is agreed by the parties, and the court found, that the contract was in writing. The third paragraph, after allegations of the making of the contract and referring to it as an exhibit made a part of the complaint, is as follows: "That under the terms of said contract the plaintiff sold to the aforesaid defendants two exciter line turbines and four generator line turbines, to be made by plaintiff and delivered to the said defendants f. o. b. cars at plaintiff's

factory in Springfield in the State of Ohio, for all of which the said defendants, by the terms of said contract promised and agreed to pay to plaintiff the sum of $32,420; payable in installments as in said contract provided; and plaintiff further avers that under the terms of said contract, and at the special instance and request of said defendants, it furthermore furnished materials and performed labor, for which said defendants undertook and agreed to pay this plaintiff the reasonable value thereof; and that the reasonable value of such additional materials furnished and labor performed is $318.50; that said defendants from time to time made payments under said contract for said turbines and said additional materials furnished and labor performed amounting in all to $22,792.77, a bill of particulars of all of which is filed herewith and made a part hereof, and marked exhibit 'B'; and plaintiff further avers that it did deliver said turbines f. o. b. cars at their factory in Springfield, Ohio, to the said defendants; and that this plaintiff has fully performed all of the terms and conditions of said contract by it to be performed, and that said defendants have received and accepted said property, but have failed to pay plaintiff according to the terms of said contract; that there is now due and unpaid the residue of $9,945.73; that of said residue $2,516.25 was due and payable on or before May 26, 1905,—and $7,429.48 was due and payable on or before June 26, 1905; that there has accrued on said unpaid balance, interest at six per cent per annum, amounting to $1,355.27; and that there is now due plaintiff from said defendants under said contract, and wholly unpaid, the sum of $11,301. Wherefore plaintiff sues and demands judgment for twelve thousand ($12,000) dollars, and for its costs herein, and for all other proper relief."

The fourth paragraph is not different in legal effect from the third. It alleges the sale and delivery to appellants of two "exciter line turbines" and two "generator line turbines" under the contract at the contract price at one

time and two additional "generator line turbines" at a
later time by a later written order referred to as another
exhibit.    Otherwise the allegations and the demand are the
same as in the third.

Appellants answered the complaint in five paragraphs.
The first is a general denial and the second a plea of pay-
ment.    The third paragraph sets up certain guaranties and
conditions relating to the power and efficiency of the tur-
bines and alleges their failure, after installation, to meet
these requirements as to power and efficiency, for which
failure appellee's right to recover anything is denied. This
paragraph of answer is conceded by appellants' counsel to
be merely an argumentative general denial.

The fourth paragraph of answer is pleaded as a counter-
claim and in it the execution of the contract shown by the
exhibits, which are made a part of the complaint and a part
of this counterclaim by reference.    It is then alleged that
pursuant to that contract appellee did furnish to appellants,
together with the other turbines and materials not in contro-
versy in this appeal, the four units of "generator line tur-
bines" in question; that by the terms of the contract appellee
warranted that each of these units could and would, under
ordinary conditions, generate 1,750 horse power under a
working head of 18 feet and under such conditions would
make 120 revolutions per minute; that appellee further war-
ranted that each of these units would furnish 1,200 horse
power under a working head of 15 feet and under such con-
ditions maintain a speed of 120 revolutions per minute; that
all of these turbines were furnished by appellee and received
by appellants under an express warranty in the particulars
named.    It is then alleged that these units will not furnish
1,750 horse power each under a working head of 18 feet and
make 120 revolutions per minute as warranted but, on the
contrary, will not furnish over 1,200 horse power each; that
they will not furnish 1,200 horse power each under a work-
ing head of 15 feet, but, on the contrary, will not furnish

over 800 horse power under the working head of 15 feet. It
is then alleged that it was warranted by appellee that each
unit should be of such dimensions and construction as to
easily and without undue fatigue of any part, develop and
deliver the combined power of wheels at full gate, on one
end of the shaft when operating under a maximum effective
head of 22 feet, measured from the surface of the water in
the tailrace under the turbines to the surface of the water
in the forebay above; that the said wheels were not of
·dimensions and construction so as to, without undue fatigue
of any part, develop and deliver the power as in said con-
tract set out and specified, but, on the contrary, they have
wholly failed to furnish the amount of power warranted by
the terms of the contract. It is further alleged that under
the specifications which formed a part of the contract these
units were furnished for direct coupling to a shaft for the
generating of an alternating current of 1,000 kilowatts of
electricity and were warranted to run at a constant speed of
120 revolutions per minute under all variations of the load
within their capacity, and under all variations of head down
to 15 feet, but that they will not perform the work as speci-
fied and warranted. It is further alleged that these turbines
were warranted to develop an efficiency of not less than 75
per cent under actual working conditions at a constant speed
of 120 revolutions per minute under an effective head of 18
feet with a three-fourths gate opening, but that they will not
develop such efficiency under such conditions. It is then
alleged that appellants have at all times been ready and
willing to perform all their part of the contract but that ap-
pellee failed to do so and that by reason of appellee's failure
in the particulars alleged that appellants owed appellee
nothing, but that they had been ·damaged in the sum of
$12,000, for which sum they asked judgment.

The fifth paragraph is also pleaded as a counterclaim and
its allegations are the same as the fourth paragraph except
it is alleged that appellants paid appellee $22,792.77 on the

contract price in the belief that appellee had furnished them turbines of the kind, quality and capacity agreed upon; but that by reason of their incapacity to perform the work warranted they were worth $12,000 less than the contract price which sum they asked to be recouped against any sum found due appellee.

Appellee demurred to each the third, fourth and fifth paragraphs of answer. These demurrers were overruled and appellee excepted. The issues were closed by a reply of general denial addressed to the second, third, fourth and fifth paragraphs of answer. The issues were tried by the court and, upon the request of both parties, the facts were found specially and conclusions of law stated thereon. The court stated as its first conclusion of law upon the facts found that appellee was entitled to recover on its complaint $12,804.45. The second conclusion of law was that appellants were entitled to recover upon their counterclaim $5,720. And the third conclusion of law was that appellee was entitled to a judgment against appellants for the difference, $7,084.45, with interest from the date of the finding at the rate of six per cent and judgment was rendered accordingly.

Appellants excepted to each conclusion of law and rely for reversal on the claim that the first and third conclusions were erroneous.

Appellee assigns cross errors which call in question the rulings on appellee's demurrers to the third, fourth and fifth paragraphs of appellants' answer and the correctness of the second and third conclusions of law.

The special finding is very long and contains much that is mere evidence. The material facts found show that under date of June 13, 1902, appellee submitted to appellants a written proposal to furnish them the water turbines in question. The proposal is set out in the finding and is identical with that attached to the complaint as an exhibit, as a part of the written contract, and, so far as it is material, is as follows:

"We propose to furnish five Trump turbines on draft-chest. Turbines to have shafts as follows:

Beginning with 11 in. in diameter,.......1st wheel.
Reduced to 10 in. in diameter,.....2d and 3d wheel.
8 in. in diameter,...............4th and 5th wheel.

These turbines to be of our best make with forged steel buckets. The diameter of runner to be such as will give the proper speed under your head. Figuring on 15-foot head the wheels to give 1200 h.p. and make 120 r.p.m. Figuring on 18-foot head the wheels to give 1750 h.p. and make 120 r.p.m."

The proposal then continues with a description of the kind of material, gates, draft-chests, stands, exciter wheels, and water cushions all appurtenant to the "Generator Line Turbines" and then the following:

"We guarantee to carry the turbines absolutely in one position without any end movement of the shaft using this device.

We guarantee the generator line to give 1750 h.p. under a working head of 18 feet, and make 120 r.p.m.

We also guarantee 1200 h.p. at 15 foot head and maintain a speed of 120 r.p.m.

We guarantee the exciter line to give 200 h.p. and make 230 r.p.m.

### PRICE.

Exciter line ...........$1500.00 f.o.b. cars factory.
Generator line .........$7355.00 f.o.b. cars factory.

### TERMS.

$\frac{1}{2}$ cash on receipt of goods at destination.
$\frac{1}{4}$ in 90 days from date of shipment.
Balance in six months from date of shipment.

We guarantee runners of our turbines against breakage from actual use for a period of six years and should a runner break within that time, we furnish a new one f.o.b. free of charge."

The proposal was met by additional specifications for the turbines and work prepared and submitted by appellants, the material parts of which are as follows:

"Specifications cover turbines for direct coupling to shaft of 1000 kilowatt alternating current generators.

\* \* \* Turbines are to be of the horizontal shaft type, set in open masonry flume. \* \* \* Each unit of five \* \* \* wheels shall be of such dimensions and construction as to easily, and without undue strain or fatigue of any part, develop and deliver the combined power of wheels at full gate, on one end of the shaft when operating under a maximum effective head of 22 feet (measured from surface of water in tailrace under turbines to surface of water in forebay above turbines). \* \* \* These turbines are to run at a constant speed of 120 r.p.m. under all variations of load within their capacity, and all variations in head down to a minimum of 15 feet effective head.

The turbines must develop an efficiency of not less than 75 per cent under actual working conditions at a constant speed of 120 r.p.m. under an effective head of 18 feet, with $\frac{3}{4}$ gate opening.

The following table gives figures for each of these five wheel units, which the builder guarantees wheels to perform at 120 r.p.m. when set as shown on attached drawing No. B-154.

| Head in feet. | 15 | 18 |
|---|---|---|
| Horse power developed on shaft will be not less than | 1,200 | 1,750. |
| Cubic feet of water used per minute will be not more than | | |

Should power exceed that named a proportionate increase in water consumption will be allowed.''

These specifications continuing, then describe the kinds of materials and construction to be used in the appurtenances to the turbines and then state the following:

''The contractor for turbines agrees to replace, free of all charge, any and all parts which may prove defective within one year from date of starting, providing that such defects are shown to have existed when wheels were started, and that same were caused by poor design, material or workmanship.

All work is to be furnished under the inspection and supervision of Sanderson and Porter (or their duly authorized representative), engineers and contractors for above installation.

All general and detailed drawings are to be furnished to and approved by Sanderson and Porter.

The maker guarantees that all runners will show an efficiency of not less than 80 per cent when tested on verticle shaft, under following conditions: head 15 feet to 16 feet, speed 113 to 116 r.p.m.

The right is reserved by Sanderson and Porter to have at their discretion, any or all of the turbines tested after being put into commission to determine the fulfilment of guarantee as to strength of parts, amount of power developed, and efficiency of units before final settlement is made. The expense of such test, if made, is to be paid by the purchaser.

Purchaser is to furnish base plates, I-beam husk frames, draft tubes, flume heads complete with babbitted adjustable, self oiling, bearing, and generator coupling with key.

Purchaser is to pay all freights, cartage, handling and erection expenses, and to furnish all common and other labor for erection. These are a part of a contract between Trump Mfg. Co. and Sanderson and Porter, dated June 13, 1902, and accepted July 19, 1902.''

The proposal of appellee and the specifications of appellants were mutually accepted and became the contract between the parties, July 19, 1902. On June 6, 1903, appellee delivered to appellants two units, that is, two lines of five wheels each, of the generator line turbines, on January 28, 1904, the third unit and on June 26, 1905, the fourth. The four units of generator line wheels delivered to appellants by appellee were standard Trump turbines horizontal shaft type of the size, dimensions and material, constructed and arranged, and provided with shafts and mounted on draft chests with journal boxes and water cushions, as described in the contract, in so far as size or dimensions were given therein, and were delivered to appellants by appellee in and as a performance of their contract. Prior to the shipment of units 1 and 2, they were set up in the factory of the appellee and one Lang, hydraulic engineer and general superintendent of construction of power plant for appellants, examined and inspected said units 1 and 2. Units 3 and 4 were duplicates in construction, dimensions and

material and workmanship of units 1 and 2, and all of the units 1, 2, 3 and 4, were identical and similar in all of their parts.

Units 1 and 2 were installed by appellants in flumes at the Twin Branch dam of the St. Joseph and Elkhart Power Company during the fall and winter of 1903 and were ready for operation in January, 1904. Unit 3 was installed in a flume at the dam after March 21, 1904, and was ready for operation June 1, 1904. Unit 4 was installed in a flume at the dam in the summer of 1905 and was ready for operation in the fall of 1905.

After the organization of the St. Joseph and Elkhart Power Company of which one of the appellants was an organizer and stockholder, it entered into a contract with the Union Construction Company, a Connecticut corporation, for the construction of its dam and power plant with all equipment including the water turbines. Appellants became subcontractors for construction and equipment including turbines. The St. Joseph and Elkhart Power Company, March 12, 1903, mortgaged its plant including real estate, rights and franchises, equipment and machinery of every description, including turbines, then owned or thereafter to be acquired, to a trustee to secure $600,000 of construction bonds. These bonds were to be delivered by the trustee from time to time as the work progressed to the Union Construction Company. The turbines sold by appellee to appellants and installed by the latter were the only water turbines installed in the flumes of the power plant from the inception of the St. Joseph and Elkhart Power Company to the time of suit. The affairs of the Union Construction Company were wound up in 1904 or 1905. June 22, 1907, the St. Joseph and Elkhart Power Company was merged into the Indiana and Michigan Electric Company which became the owner of all the property of the former concern and took possession of it and used it in the

business of producing and selling power. One of appellants was a director of the new company and appellants were at all times stockholders of both companies. Prior to July 24, 1907, the mortgage to secure construction bonds was released and on that date the property of the Indiana and Michigan Electric Company, specifically including turbine wheels, was mortgaged for $7,000,000. On July 25, 1907, another mortgage for $900,000 was given covering the same property. Appellants at all times knew all the facts relating to the incorporation of the St. Joseph and Elkhart Power Company; its construction contract with the Union Construction Company and the closing up of the affairs of the latter; the various mortgages; and the merger.

Immediately after the installation of each of the four units of generator line turbines, and as soon as they were ready for operation, they were put in use and operation by the St. Joseph and Elkhart Power Company for the development of power for commercial purposes. The use of units 1 and 2 began in January, 1904, of unit 3 in June, 1904, and of unit 4 in December, 1905, and such use was continued by that company and its successors up to the time of bringing this suit and after.

Appellee knew before and at the time the contract was made that the turbines were to go into a hydro-electric plant which was not the property of appellants, and that the plant was in process of construction; and appellee was informed that the owner desired its speedy completion and intended it to go into operation before all the turbines were furnished and before the last payment on those furnished would be due under the terms of the contract and that the plant was in the hands of the operating company, and made no objection. At the time of making the contract appellee knew the conditions and place, purpose and manner in which the turbines were to be installed and used and was familiar with the conditions under which they were required

to operate after their installation and never made any objection to their use by the operating company.

The turbines which appellee agreed to furnish appellants under the contract were of a kind and character and of such construction that the amount of power which they would develop and the efficiency which they would show in working condition could not be known by an inspection of them after their manufacture, but that their power and efficiency under the terms and conditions of the contract could only be known and determined by a practical test or trial in a flume and operated by water power. By reason of the character of the flumes and water power plant of the St. Joseph and Ekhart Power Company at Twin Branch, where said wheels were installed, and by reason of their being set and placed on horizontal shafts, it was physically impossible to test the efficiency of said wheels on a vertical shaft at the Twin Branch dam; that the efficiency of said wheels could be tested when used on vertical shaft, at the testing flume of Holyoke, Massachusetts; that said fact was well known both to appellee and appellants; and one of appellants had the clause referring to 80 per cent efficiency on a vertical shaft inserted in the contract so that they would have the right to make the test at Holyoke. If said wheels had been tested at the testing flume at Holyoke on vertical shaft, and the result obtained therefrom, that such results or facts could be used as a basis from which to calculate and ascertain the efficiency as well as the power of said wheels on a vertical shaft at all times and under all like conditions. Neither of the turbines, nor any part of them, were ever tested at the Holyoke testing flumes, either before or after their installation, nor were they ever tested by any mechanical or brake test, at the Twin Branch dam, after being put in commission, or elsewhere; and such water wheels or turbines, either in whole or in part, were never tested by any kind or character of tests under the exact

physical condition set forth in the contract; nor were they ever tested under an exact 15-foot or 18-foot head by any kind of test, by the appellants or by any other person for them. There never was any measurement made by the appellants, or any other persons for them, through weir, or any other approved form of device, of the volume of water available at the dam, or the water used by any of said lines of turbines. If a wheel of a given type and size is tested in testing flumes, and the quantity of water discharged by it is ascertained, it would become the basis of a water meter, and the volume of water passing through it, or through any wheel made on the same form, at any given head, could be computed. The power of the turbines was never read or ascertained by or through any mechanical or brake test, either at Twin Branch or elsewhere and the only readings or statements of the power given by said wheels at any time since they were made, were taken from electrical instruments, after the power had been developed electrically through generators, and transmitted to the switchboard, and then read in kilowatts, and then reduced to horse power.

Prior to June 13, 1902, the parties through their representatives met at Springfield, Ohio, and the appellee then and there informed appellants that it would not sell any of its wheels or water turbines with any guarantee to depend upon any electrical test, or test made by any electrical device; that after the execution of the contract or proposition of July 19, 1902, nothing was said or written by either party with reference to any test clauses in the contract, until March 9, 1904; that from the fore part of July, 1904, at which time the appellants first informed appellee of the result of switchboard readings of the June, 1904 electrical test, that appellee within a reasonable time, declared and maintained that the provisions of the contract concerning tests meant a Holyoke or mechanical brake test, and that appellee during all of said time maintained and declared the same position with reference to the test clauses in said

contract, and maintained and insisted that the wheels furnished gave all the power, speed and efficiency guaranteed, and were furnished in full performance of their contract; that the appellants in all of their correspondence and conversations with appellee, during all of said time following, never disputed the construction of said contract by appellee as to Holyoke or mechanical brake test; that in February, 1904, the third unit had not yet been installed, and was lying upon the ground at Twin Branch, the fourth unit was not manufactured, and that the same was not delivered until June, 1905, thereafter; that thereafter appellants proposed and offered to compensate and reward appellee if it would concede the making of an electrical test, and agree to be bound by the same, but that appellee refused such offers, and insisted that it would stand upon the contract; that the appellants thereafter proposed and offered to make a mechanical test; that this offer of appellants was coupled with the condition by which in substance and effect appellants required of appellee that it agree to the finding of some third person in the capacity and character of an arbitrator, and further required of the appellee that it agree to be bound by the finding of such arbitrator; that appellee made no objection to the character of such test, but notified appellants that it refused to modify the contract, or to accept such third person as arbitrator and to agree to be bound by his finding; that thereupon the appellants refused to make any further tests whatever, or to pay any further sums due under said contract whatsoever, until appellee would agree to abide by the result of any further test made. During the last half of the year 1906, and up to September, 1907, the date of the commencement of this action, and while the plant and turbines were in the control and possession of the St. Joseph and Elkhart Power Company, that company informed the parties that it could not at such time permit the use of said plant or wheels, by either appellee or appellants, on account of load conditions; and that in May,

1907, said operating company informed the appellee that it could probably have the use of a line of said turbines within a year, for the purpose of making a test.

In what is known as an electrical test of water turbines, the power and the efficiency of the water turbines is necessarily measured by the power and efficiency of the electrical generator or generators, and depends on the accuracy of such electrical devices. The instruments used for the measurement of electrical currents, during the electrical test conducted at the Twin Branch dam, in June, 1904, were not calibrated at the United States Bureau of Standards, in Washington, D. C., before such test. The electrical generators in the Twin Branch dam were generators manufactured by the Westinghouse Electric Mfg. Company, of a voltage of 13,500 volts; and said instruments were not returned to said Westinghouse Electric Mfg. Company, to prove back their accuracy or variation, at any time after such test. At the time of said electrical test conducted at the Twin Branch dam in June, 1904, the power of said generators was reduced through transformers, by the multiple of 2,000, and all results and readings obtained, in order to measure the full capacity of said generators, had to be multiplied by 2,000. Prior to June, 1904, at least two of the generators broke down, and it was necessary to rewind the same, which was done at the power plant at Twin Branch, prior to June 1, 1904. At the electrical test made in June, 1904, there were only three generators on the ground; and during the test one generator was run as a motor, and another as a generator. After the two electric generators were rewound as aforesaid they were never tested as to their efficiency. The only bases of all statements as to the power of the turbines are the results of power generated through these Westinghouse electric generators.

The court further found that the log sheets in evidence indicating the power and efficiency of the turbines are the records of the operating company, and were not made by,

or on behalf of, or under the supervision of the appellants; that the records or log sheets were made from electrical or switchboard readings, after the power of the water wheels had been transformed into electrical energy, through the Westinghouse generators; and that the operating company, in making said readings from such electrical meters or measuring devices, did not check or correct said meters by the use of any calibrated instruments, either immediately before or immediately after the readings; that all of such measurements and readings were made and recorded by operators in the employ of the operating company; that the log sheets in themselves do not show at what gate openings the wheels were operating during any of the readings recorded therein.

Within a reasonable time after delivery appellants notified appellee that trials of the turbines indicated that they were not in accordance with the contract and on December 31, 1903, they notified appellee that they would withhold acceptance of units 1 and 2 until a test could be made and that in case of any shortage or deficiency, appellants would look to appellee to correct it at appellee's expense, regardless of payments made to it.

Immediately after the installation of units 1 and 2 and before the installation of unit 3, and while unit 3 was lying upon the ground at Twin Branch dam, and before any work was done thereon preparatory for its installation, appellee advised appellants by letter of March 9, 1904, which letter was received by appellants, that if they were not satisfied as to power, to ship unit 3, or one of the wheels thereof, to the testing flume at Holyoke, Massachusetts, to be there tested in regard to power, as they had that privilege under the contract, before any further units were installed at Twin Branch dam; but that appellants wholly failed and neglected to send either said unit 3 or unit 4, or any parts thereof, to the testing flume at Holyoke, but proceeded to install the same, and did install the same, without any such test; that unit 4 was not shipped to appellants until June,

1905, but was thereafter received by appellants and installed. On March 9, 1905, appellee had information that the operating company had not accepted units 1, 2 and 3.

The court further found the total amount of the agreed purchase price of the four generator lines and two exciter lines to be $32,420 with payments as follows: June 3, 1903, $8,000; August 27, 1903, $3,000; September 23, 1903, $2,261.70; January 4, 1904, $4,448.30; March 15, 1905, $1,838.75; May 27, 1905, $3,000, making a total of $22,548.75 and leaving a balance unpaid of $9,871.25.

The finding further shows that the four units were installed in accordance with the terms of the contract and, as shown by blue print drawings accompanying it, and that the reasonable cost and expense incurred by appellants in making the installation was $11,580; that the four generator lines of turbine wheels delivered to appellee were not so constructed that they would develop 1,750 horse power per line of five wheels, under a working head of 18 feet, and make 120 revolutions per minute, and were not so constructed that they would develop 1,200 horse power per line of five wheels, under a working head of 15 feet, and make 120 revolutions per minute; that each of the four generator lines had the capacity to develop 1,523 horse power, and no more, under a working head of 18 feet and make 120 revolutions per minute; and each of them had the capacity to develop 1,044 horse power, and no more, under a working head of 15 feet, and make 120 revolutions per minute; that the four generator lines were not so constructed that they would develop an efficiency of not less than 75 per cent under actual working conditions, at a constant speed of 120 revolutions per minute, under an effective head of 18 feet, with three-fourths gate opening; that if each of the four generator lines had developed the power and shown the efficiency which appellee by its contract with appellants agreed and represented that they would develop and show, the value of the four lines installed in the power house, in

working condition, with an electric generator attached to the shaft of each of the four lines of wheels of sufficient capacity to generate and transmit all of the power from them, the four generator lines, in such working condition, together with the generators attached thereto, would have been of the fair and reasonable value of $132,000; and said four generator lines of turbine wheels, together with the generators attached to the lines as aforesaid, after being installed in the power house, and in good working condition, were of the fair and reasonable value of $114,840, and no more; that if the four generator lines had been so constructed as to develop the horse power and show the efficiency specified and agreed to be developed and shown under the contract between the parties, their value, installed in the power house, in working condition exclusive of the generators attached to the shafts of the lines would have been $44,000; that the four generator lines, as delivered and installed in the power house, in working condition, exclusive of the generators, are of the value of not to exceed $38,280.

The contention of appellants' counsel that the court erred in stating the first and third conclusions of law in favor of the right of appellee to recover the balance of the purchase price, is based upon the assumption that the burden was upon appellee to aver and prove performance of the contract by it by showing not only that it delivered to appellants the turbines and appurtenances contracted for, but also that they complied in every particular with the terms of the contract. In other words, as we understand counsel, they claim that the burden was on appellee to aver and prove, as a condition precedent to a recovery of the balance of the purchase price, that the articles contracted for and delivered to appellants, fulfilled in every respect, including power and efficiency, the stipulations of the contract. And it is contended that as this burden rested on appellee and the court found that the turbines did not show the power and efficiency provided for and failed to find as to their com-

pliance with the terms of the contract in other respects, this was a finding against appellee on all, and the appellee was not entitled to recover the balance of the purchase price, and the first and third conclusions of law were therefore erroneous.

A warranty in a sale of goods is not an essential element of the contract, for a sale is complete without it. It is an independent agreement forming part of the contract but collateral thereto, and the rule is that in an action on a contract of sale to recover the purchase price of goods sold and delivered, the seller is not bound to show fulfilment of warranties, the burden of showing the existence of a warranty and the breach of it being on the buyer whether he sues for the breach of warranty directly or sets it up by way of set-off or counterclaim. *Neal v. Shewalter* (1892), 5 Ind. App. 147, 31 N. E. 848; *Seiberling & Co. v. Rodman* (1896), 14 Ind. App. 460, 466, 43 N. E. 38; *Plano Mfg. Co. v. Root* (1893), 3 N. D. 165, 54 N. W. 924; *Reynolds v. Cleveland* (1825), 4 Cow. (N. Y.) 282, 15 Am. Dec. 369; *Buckstaff v. Russell* (1894), 151 U. S. 626, 14 Sup. Ct. 448, 38 L. Ed. 292; *Noble v. Fagnant* (1894), 162 Mass. 275, 38 N. E. 507; *Burt v. Garden City Sand Co.* (1909), 237 Ill. 473, 86 N. E. 1055; 19 Ency. Pl. and Pr. 33; 35 Cyc. 549, *et seq.; Keystone Mfg. Co. v. Forsythe* (1900), 123 Mich. 626, 82 N. W. 521; *Stillwell Co. v. Biloxi Co.* (1901), 78 Miss. 779, 29 South. 513.

Counsel for appellants, however, seek to evade this rule by the claim that the provision contained in that part of the contract involved in the specifications presented by appellants, which reserved to them the right "to have, at their discretion, any or all of the turbines tested after being put into commission to determine the fulfilment of guarantee as to strength of parts, amount of power developed, and efficiency of units before final settlement is made," when taken together with the fact that the turbines were to become incorporated in a hydro-electric

power plant, which would make a return of them practically impossible after a test, made the stipulations in the specifications as to the quality, capacity and efficiency of the turbines, dependent conditions or conditions precedent which appellee was bound to show performance of before it could recover the balance of the purchase price. But the claim is not permissible. On the contrary, it seems obvious that the intention of the parties was, that the title should vest in appellants on delivery and that these stipulations were independent agreements or warranties. There is nothing to indicate any possible intention of the parties to rescind the contract and return the turbines after they had been delivered, placed in position and tested. But the nature of the articles sold and the disposition of them together with the provision of the contract just above quoted, shows clearly the intention on the part of appellants to rely upon these stipulations as warranties.

"Where from a consideration of the whole instru-
4.  ment it is clear that the one party relied upon his remedy, and not upon the performance of the condition by the other, such condition is not a condition precedent." Benjamin, Sales (Bennett's 7th ed.) §562. It is said by the author that the dependence or independence of covenants in a contract of sale is to be collected from the evident sense and meaning of the parties and that in applying the rule of construction quoted, the circumstances under which the contract was made, and the purpose for which it was made, are to be taken into consideration. Assuming that nothing had been paid and this were an action for the entire contract price, it could not well be believed that appellee could have had it in mind to sell to appellants the turbines to be fixedly installed on the condition that he was to exact nothing from appellants if there was found a small measure of failure to comply with the covenants as to quality, power and efficiency.

Moreover, if it should be conceded that these stipulations

are conditions precedent, it would not save counsels'
5.  contention that a failure of appellee to show a perfect
performance of the conditions must defeat this
action.  A rule well founded in justice is to the contrary.
"Although a man may refuse to perform his promise till
the other party has complied with a condition precedent,
yet, if he has received and accepted a substantial part of
that which was to be performed in his favor, the *condition
precedent changes its character* and *becomes a warranty, or
independent agreement,* affording no defense to an action,
but giving right to a [counterclaim] for damages.  The
reason is, that it would be unjust under such circumstances
that a party who has received a part of the consideration
for which he bargained should keep it and pay nothing be-
cause he did not receive the *whole.*  The law, therefore,
obliges him to perform his part of the agreement, and leaves
him to his action of [or counterclaim for] damages against
the other side for the imperfect performance of the condi-
tion."  Benjamin, Sales (Bennett's 7th ed.) §564.  In 1 Beach,
Contracts §107 it is said:  "Conditions precedent must
be performed in order to make the conditional promise abso-
lute.  But after one party has performed the contract in a
substantial part, and the other party has accepted and had
the benefit of the part performance, the latter may thereby
be precluded from relying upon the performance of the
residue as a condition precedent to his liability; and in
such case he must perform the contract on his part, and
must rely upon his claim for damages in respect of the de-
fective performance."  See, also, Clark, Contracts (2d ed.)
466; Tiedeman, Sales §197; *Young Bros. Mach. Co.* v.
*Young* (1896), 111 Mich. 118, 69 N. W. 152.

In the case before us delivery and acceptance were
6.  alleged, and the court found that the turbine units
were completely set up in appellee's factory and
inspected by appellants' engineer and general superintend-
ent of construction; that they were standard Trump tur-

bines of the type, size, dimensions and material, and constructed and arranged with appurtenances as described in the contract, and that they were delivered to appellants; that appellants installed them in the hydro-electric power plant of a third person and that person dealt with them as his own by using them, mortgaging and transferring them as an integral part of his plant to others and that they were in constant use as a part of the power plant for several years with no offer to return them. After the two units first delivered, were installed by appellants and as they claimed, found to be lacking in power and efficiency they received and installed the third and fourth units. The facts so found established substantial performance by appellee and such an acceptance as would preclude appellants from rescinding and returning the articles delivered or from relying upon exact performance as a condition precedent to their liability to pay the purchase price, but not from asserting their claim for damages for defective performance. The acts of appellants and the owners of the plant in dealing with the turbines were of such a character that they could only be rightfully done if they were the owners of them and were utterly inconsistent with the claim that the contract had not been executed by their acceptance. Benjamin, Sales (5th Eng. ed.) 1013; Benjamin, Sales (Bennett's 7th ed.) §§703, 901; 2 Mechem, Sales §§1380, 1387, 1395, and cases there cited; Tiffany, Sales §§94, 120, 121; *Stillwell Co.* v. *Biloxi Co., supra; C. & C. Electric Motor Co.* v. *D. Frisbie & Co.* (1895), 66 Conn. 67, 93, 33 Atl. 604; *Fred W. Wolf Co.* v. *Monarch Refrigerating Co.* (1911), 252 Ill. 491, 96 N. E. 1063.

It is also contended that the conclusions of law 7. favorable to appellee are erroneous in that they allowed interest of six per cent on the balance of the purchase price from the date when the payments on the units in controversy were due under the terms of the proposal to the date of the finding. The conclusions were not

erroneous in this respect. Appellants having accepted the delivery of the turbines, were bound to perform their part of the contract by payment according to its terms. The statute provides that money due on any instrument in writing shall bear interest at the rate of six per cent. §7952 Burns 1908, §5200 R. S. 1881. The general rule in this country is that interest as damages for the breach of a contract to pay money, where the amount due and the time of payment are certain, is recoverable as a matter of right. 22 Cyc. 1579. See, also, *Skehan* v. *Rummel* (1890), 124 Ind. 347, 24 N. E. 1089; *Killian* v. *Eigenmann* (1877), 57 Ind. 480; *Burke* v. *Keystone Mfg. Co.* (1898), 19 Ind. App. 556, 561, 48 N. E. 382. The provision in the specifications reserving to appellants the right to test the turbines after being put in commission, to determine the fulfilment of guarantee as to strength of parts and power and efficiency of units before final settlement, did not, as contended by counsel, have the effect of postponing and making uncertain the time of payment, and the findings show that the parties did not so consider it. The terms of payment were fixed by the proposal of appellee at one-half cash on receipt of goods at destination, one-fourth in 90 days from date of shipment and the balance in six months from the same date. Payment according to these terms was an essential condition of the contract of sale to be performed by appellants. The very terms of the provision of the specifications show that it had reference to the collateral agreement of warranty. It follows that the court did not commit error against appellants in its conclusions of law 1 and 3.

The findings and conclusions of law being favorable to appellee on the issues presented by the third paragraph of answer, appellee's assignment of cross error on the action of the trial court in overruling the demurrer to it does not demand consideration.

Counsel for appellee, in support of the assignment of cross error on the action of the court in overruling their demurrers to the fourth and fifth paragraphs of appellants' answer which were by way of counterclaim, urge that these pleadings were clearly deficient in certain essential allegations. As the warranties went to the performance of the turbines as to power and efficiency after installation, and as appellee had nothing to do with the installation, that duty resting wholly upon appellants, and as the power and efficiency of the turbines in actual operation after being installed depended upon the manner of installation, the character of the draft tubes, the volume of water available, the opening of the gates, the amount of the fall, obstructions and retardations to the flow of the water in the tailrace and other things incident to their situation which would affect their performance, and as the fulfilment of the warranties of the turbines under the terms of the contract could only be determined by a test, it was therefore, it is claimed by appellee, incumbent upon appellants either to allege generally a performance of conditions on their part or to allege facts showing a proper installation and an efficient test. As this was not done it is claimed that the fourth and fifth paragraphs are bad. It is also contended that the warranties as averred in their pleadings are not in terms coextensive with the written contract, and that the breach of them is not sufficiently negatived. From this claim of the insufficiency of these paragraphs of counterclaim on the warranties the further claim of counsel for appellee arises, that the findings upon which the conclusions of law that appellants are entitled to recover damages for the breach of the warranties, are outside the issues and the conclusions erroneous.

10. As we have seen, the burden of establishing the warranty and breach of it is on the buyer whether presented in an action or counterclaim. Involved

in this burden is the duty of showing a performance of all material conditions upon which the right to assert the warranty depends. 35 Cyc. 445, 457.

It was for appellants to show in some adequate way a breach of the warranties in the particulars relied upon. They chose by the terms of that part of the contract prepared by them to make the fulfillment of the warranties depend upon a test to be made after the installation by them. Indeed it is perhaps true that, from their very nature, the power and efficiency of the turbines could only be accurately determined by some definite recognized test. As appellants had reserved to themselves and assumed the duty of making a test and as the duty of showing a breach of warranty rested upon them, they were therefore bound to show a proper installation and an efficient and accurate test, within a reasonable time, under actual working conditions which would have demonstrated that the warranties had been broken. *Lafayette Agri. Works* v. *Phillips* (1874), 47 Ind. 259; *Robinson Mach. Works* v. *Chandler* (1877), 56 Ind. 575; *Johnston Harvester Co.* v. *Bartley* (1882), 81 Ind. 406; *McClamrock* v. *Flint* (1885), 101 Ind. 278; *Shirk* v. *Mitchell* (1894), 137 Ind. 185, 36 N. E. 850; *Osborne & Co.* v. *Hanlin* (1902), 158 Ind. 325, 329, 63 N. E. 572; *McKendry* v. *Sinker, Davis & Co.* (1891), 1 Ind. App. 263, 27 N. E. 506; *Brower* v. *Nellis* (1893), 6 Ind. App. 323, 331, 33 N. E. 672; *H. B. Smith Co.* v. *Williams* (1902), 29 Ind. App. 336, 342, 63 N E. 318; *Mack* v. *Sloteman* (1884), 21 Fed. 109; *International Bow, etc., Co.* v. *United States* (1894), 60 Fed. 523; *F. D. Cummer & Sons Co.* v. *Marine Sugar Co.* (1906), 146 Fed. 240, 76 C. C. A. 606.

The finding of facts is either directly against appellants or silent on all the various specifications of warranty except as to the amount of horse power to be developed and the per cent of efficiency of the four generator line units. The rule is too familiar to require the

citation of precedents that a failure to find the existence of essential facts is equivalent to a finding against the party having the burden of establishing such facts. The conclusion of law that appellants were entitled to recover damages for breach of warranty must therefore rest upon the failure of the four generator line units to fulfil the specifications of the warranty that they would develop the power and efficiency required by the terms of the contract when properly installed and tested under proper conditions.

It is, of course, true, as claimed by counsel for appellee, that, in determining whether the facts found justified the conclusion of law in this respect, only the facts found within the issues can be considered. It is contended by counsel that the findings of the court relating to the installation and test of the turbines by appellants are without the issues and cannot be considered in support of the conclusions of law favorable to appellants.

But assuming that the facts found are within the issues we think that they fall short of sustaining the conclusions. It is true that the finding states that appellants installed all of the turbines in accordance with the terms of the contract between appellee and appellants, but it is not shown that the structure in which they were installed and of which they became a part and which had a relation to them was of a character which would permit the turbines properly to demonstrate their power and efficiency. There is no express finding that any test was ever made but it may be gathered from various parts of the finding that appellants made what was claimed to be an electrical test in June, 1904. As it also appears from the finding that the fourth unit was not delivered and installed until 1905, obviously this test was not applied to it, and it nowhere appears in the finding that the unit was ever subjected to any test. But this test, if made, is not found to have been a standard or recognized one, or one permitted

under the contract nor is it found that it was an accurate test. The accompanying facts not only fail to show its accuracy, but on the contrary tend to discredit it. It is found that there never was any measurement by any approved device of the volume of water available at the dam, or the water used by any of the turbines; that the readings of the power generated were taken from the switchboard after the power had been developed through electrical generators reduced by transformers attached thereto and thence transferred to a switchboard from which the readings were made, and in this test one of the generators was run as a motor and another as a generator. None of these electrical instruments, including the measuring devices, were found to be accurate but, on the contrary, it is found that two of the three generators used had broken down and required rewinding which was done prior to the test of June, 1904, and were not afterwards tested as to their efficiency. And it is also found that the accuracy of other electrical instruments used was not shown either immediately before or after the readings were taken which disclosed the result of the test. These measurings and readings were made by employes of the operating company and not by either appellee or appellants. It is found that the only basis of all statements as to power of the turbines is the result shown by the power generated through the electric generators above referred to. This, we think, falls short of showing with sufficient certainty even an accurate electrical test and it certainly does not meet the test provisions of the contract as shown by the findings of the court. Under the circumstances shown it would be as reasonable to use the turbines to test the generators as to use the generators to test the turbines. It appears from the findings that appellee had, prior to the making of the contract, refused to sell its turbines with any guaranty depending upon an electrical test to show its fulfilment. The contract as made does not provide for an electrical test and the only test the character

of which is specifically named therein is one which the finding shows to be a mechanical brake test. This the appellee persistently claimed from the beginning and when differences arose over the test and appellee had refused to accede to an electrical test ·appellants received and installed the third and fourth units. We think appellants were bound to show by a mechanical test a failure of the turbines to fulfil the warranty. Such a test the court finds was never made and their power never ascertained by or through any such test; and further that the turbines, either in whole or in part, were never tested by any kind or character of test under the exact physical conditions set forth in the contract, nor were they ever tested under an exact 15-foot or 18-foot head by any kind of test.

Appellants failed to make a test which was expressly provided for by them, to be made before installation, which it appears would have given some definite assurance of a fulfilment of warranties or otherwise after installation. And after installation they made no such test as shows a breach of the warranties.

Furthermore, the finding, while it states that the turbines did not show an efficiency of 75 per cent as warranted, wholly fails to show the extent of the deficiency in the per cent of efficiency. In this respect it is too uncertain upon which to base any certain amount of damages. The findings as to the shortage in horse power as found is, obviously, 13 per cent of that which the turbines were warranted to produce. In fixing the amount of damages it is apparent that the trial court added to the contract price of all the articles involved in the contract of sale, both "exciter line turbines" and "generator line turbines" and their appurtenances, the amount expended by appellants in the installation, and fixed the damages to appellants from the alleged breach of warranty as to horse power of the "generator line turbines" at 13 per cent of the sum of this addition. The correctness of this method of meas-

uring such damages is vigorously assailed by counsel for appellee, and justly. The percentage is calculated on the price of certain of the articles about which there was no controversy, the "exciter line turbines," as well as those in controversy, and the cost of installing all. Manifestly if the percentage method were permissible at all, the application of it in the manner here made would be wrong. There was no finding of the value of the "generator line turbines" delivered. It has been held in a similar case that this method of ascertaining the damages is purely speculative, and not permissible. *Hooper* v. *Story* (1898), 155 N. Y. 171, 49 N. E. 773. The usual rule is that the measure of damages for a breach of warranty in the sale of machinery is the difference between the value of the machinery delivered and the value of such as would have complied with the warranty, and the contract price is *prima facie* the latter value. *Street* v. *Chapman* (1867), 29 Ind. 142; *Booher* v. *Goldsborough* (1873), 44 Ind. 490; *Hooper* v. *Story, supra;* *Parker* v. *Fenwick* (1905), 138 N. C. 209, 50 S. E. 627; 35 Cyc. 468-470; 1 Beach, Contracts §291.

Numerous other questions are raised by appellee under its assignment of cross errors which have all a relation to the main contention that the second and third conclusions of law are erroneous, but the conclusion reached makes an examination of them unnecessary. It follows that the court committed error against appellee in stating the second and third conclusions of law. The first conclusion of law, which awarded appellee the sum of $12,804.45, was based on the finding that there was due appellee on the purchase price a balance of $9,871.25 to which was added interest from the dates when the payments under the contract were due to the date of the finding which amounted to $2,933.20. The judgment is reversed on appellee's assignment of cross errors with instructions to the lower court to strike out its second and third conclusions of law and to render judgment in favor of appellee on the first conclusion of law with ad-

ditional interest on the balance of the purchase price, ($9,871.25), from the date of the finding to the rendition of judgment added thereto.

NOTE.—Reported in 102 N. E. 2. See, also, under (1) 35 Cyc. 366; (2) 35 Cyc. 457; (3) 35 Cyc. 413; (4) 35 Cyc. 111, 413; (5) 35 Cyc. 113; (6) 35 Cyc. 239, 258; (7) 22 Cyc. 1495, 1541; (8) 35 Cyc. 262; (9) 3 Cyc. 383; 31 Cyc. 358; (10, 11) 35 Cyc. 458; (12) 38 Cyc. 1985; (13) 38 Cyc. 1969; (14) 35 Cyc. 485; 38 Cyc. 1968; (15) 35 Cyc. 468. As to implied warranty of quality on sale of chattels, see 55 Am. Dec. 328; 102 Am. St. 607. On the question of the effect of use of property purchased on approval after expression of dissatisfaction, see 14 L. R. A. (N. S.) 1107. On the effect of acceptance of goods deliverable in installments on right to rescind contract or refuse further deliveries for breach as to quality, see 38 L. R. A. (N. S.) 542. On acceptance with knowledge of breach of warranty as waiver of breach, see 35 L. R. A. (N. S.) 501. As to whether the vendee's failure to inspect or test goods constitutes a waiver of express warranty, see 24 L. R. A. (N. S.) 235.

[No. 22,411. Filed June 6, 1913. Rehearing denied October 10, 1913.]