EAGLE SIGNAL CONTROLS, A DIVISION OF GULF & WESTERN MANUFACTURING CO., Appellant/Appellee, (Plaintiff Below),

v.

MIDWESTERN ELECTRIC, INC., Appellee (Defendant Below)

and

Electric Supply Corp., Appellant/Appellee, (Defendant Below).

No. 45A03–8611–CV–321.

Court of Appeals of Indiana, Third District.

April 21, 1988.

---

1. Admittedly, a poor example upon which to base a hypothesis, but that was the evidence before the trial court.

**968**

David K. Ranich, Murphy, Mcatee, Murphy & Costanza, East Chicago, for appellant/appellee Eagle Signal Controls.

Richard Benne, Munster, for appellant/appellee Elec. Supply Corp.

Fred M. Cuppy, Merrillville, for appellee Midwestern Elec., Inc.

GARRARD, Presiding Judge.

Eagle Signal Controls (Eagle) appeals from a judgment after a bench trial in which Electric Supply Corp. (Electric) was awarded consequential damages of $144,-200 and Eagle's claim for pre-judgment interest on its award of $180,895.61 against Electric was denied. The appeal challenges the propriety of those actions.

The facts disclose that the Indiana State Highway Commission (ISHC) awarded a contract to Midwestern Electric, Inc. (Midwestern) to install traffic signal controls at several intersections in East Chicago, Indiana. Under this contract liquidated damages were to be assessed at the rate of $200 per day for each day the project required past the agreed upon contract completion date.

Eagle was to supply necessary equipment to Midwestern, but because Midwestern did not want to deal directly with Eagle as a result of previous experiences, Electric was brought in as a middleman. This was accomplished on behalf of Eagle by a manufacturer's representative known as Bell & Gustus.

During negotiations between Bell & Gustus and Electric all were aware of the liquidated damages clause in the ISHC contract. The manager of Electric testified that at his meeting with the Bell & Gustus representative it was agreed that Electric would process the order from Midwestern on the condition that any back charges against Electric resulting from performance of the contract would be borne by the manufacturer, Eagle. It is undisputed that Bell & Gustus was acting as an agent of Eagle in these arrangements.

Bell & Gustus then submitted a quotation to Electric and Electric sent a purchase order to Eagle on June 19, 1981. The quotation, which Electric attached to its purchase order, included the following:

"1. Liquidated damage acceptance per Eagle Signal Corp's statement to follow.

2. Partial shipments of line items must be approved.

3. Quote is rendered on a lump sum basis. Item breakdown will be provided upon receipt of purchase order.

4. Standard terms and conditions of sale apply.

DELIVERY:

SHIPMENT ESTIMATED WITHIN 180 DAYS AFTER RECEIPT BY EAGLE SIGNAL c/o BELL & GUSTUS, INC. OF APPROVED CATALOG CUTS AND ACCEPTABLE ORDER RECEIVED IN AUSTIN, TX (FACTORY)."

On July 21, 1981 Eagle sent the following letter to Electric:

"Dear Mr. Walenga:

Your order was received by Eagle June 25, 1981. Order processing has been initiated based upon incorporation of the following clarifications and/or understandings

Eagle's standard terms and conditions of sale are incorporated in order DIR–2647 with the same effect as if set forth in full therein.

*Shipments.* All equipment will ship from Eagle's manufacturing facilities within 32 weeks (224 calendar days) after receipt by Eagle of all approved catalog cuts. Eagle will assume responsibility for liquidated damages actually assessed by ISHC under contract T–12480, PROVIDED, Eagle due solely to its own fault or negligence has failed to meet this 32 week shipment commitment AND any damages assessed by ISHC are attributable entirely to Eagle's delayed shipment. Eagle will make partial or advance shipments as may be expedient and materials shall be invoiced at time of shipment. Payment for all materials shall be due 30 days after shipment.

Please evidence your concurrence with the above by signing and returning one copy of this letter. Due to the size of your order, we also require a copy of your most recent financials. Eagle welcomes the opportunity to supply materials to your organization and we anticipate your prompt return of the approved catalog cuts, financials and acknowledgement of this letter.

Sincerely,

s/s T.R. POOS

T.R. Poos
Manager
Contracts Administration
TRP:bjs

　　Acknowledge and Accept
　　For Electric Supply Corporation
　　By: _____
　　Name: _____
　　Title: _____"

Enclosed with this letter was a one page preprinted statement of Eagle's terms and conditions.

Electric did not respond to this letter. At trial Mr. Walenga testified that he did not respond because he considered the letter to be an attempt to modify the agreement already entered into.

In August Electric changed its order reducing the equipment desired from the original $243,000 order down to $187,100. Eagle accepted these modifications.

After several delays the project was finally completed by the parties. ISHC assessed liquidated damages of $52,000 against its contractor, Midwestern.

Eventually, Eagle commenced this suit against Midwestern and Electric; they filed cross claims; and Electric counterclaimed against Eagle.

After hearing all the evidence the trial court entered judgment:

(a) for Eagle against Electric in the amount of $180,985.61 (the amount of its claim);

(b) for Midwestern against Electric, incidental damages of $144,200, which included the $52,000 liquidated damages paid to ISHC;

(c) for Electric against Eagle consequential damages of $144,200; and

(d) for Electric against Midwestern in the amount of $198,988.60.[1]

---

**1.** No challenge has been raised to the propriety of the sums found or any ground other than those discussed in our opinion.

■ Apart from the question of pre-judgment interest, the issue presented is simply whether the agreement between Eagle and Electric permitted the award of consequential damages. Eagle contends that it did not. In support of this assertion it points to two facts. Electric's purchase order which attached the Bell & Gustus quotation contained the statement "Standard terms and conditions of sale apply." Secondly, *Eagle's* "standard terms and conditions of sale" which appeared in print as an attachment to Eagle's letter of July 21, 1981 included the statement:

Except as expressly set forth herein, there are no other warranties, express or implied, relating to the equipment. In no event shall Eagle be liable for special or consequential damages, including damages incurred in transit.

In reviewing the court's judgment, we note that it was a general judgment and is thus presumed to be based on findings supported by the evidence. Thus, if the judgment can be sustained on any legal theory, it should be affirmed. *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302, 307.

Under our uniform commercial code a contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. IC 26–1–2–204(1). Indeed this is true even though the moment of its making is undetermined (IC 26–1–2–204(2)) or one or more terms are left open if there is a reasonably, certain basis for giving an appropriate remedy. IC 26–1–2–204(3).

Furthermore, pursuant to IC 26–1–2–207:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

From the foregoing it appears that the question before us is to be resolved upon the determination of whether the reference to "standard terms and conditions of sale" contained in the order sent by Electric *must* be taken to mean Eagle's terms printed on the attachment to its letter of July 21st.

If that is the only reasonable interpretation of that reference, then Eagle is entitled to prevail since the law clearly permits the parties to exclude or limit consequential damages by agreement. IC 26–1–2–719.

We do not believe, however, that the court was required to make any such interpretation.

Here Electric's account of the negotiations and express agreements of the parties disclose the clear intention to protect Electric from consequential damages arising through the late or defective performance of the principal parties. The credibility of this evidence is buttressed by Electric's invitation into the venture clearly to simply serve as a middleman and by what might reasonably be construed as Eagle's effort to secure an agreement to modify the contract.

From that evidence the court could properly have concluded that whatever the phrase "standard terms and conditions of

sale" was intended to mean, it clearly was *not* intended to negative the express agreement to protect Electric from consequential damage claims.

In addition the court could have concluded under the circumstances that Eagle's proposed modification contained in its letter of July 21 was a material alteration or that notification of objection to it had already been given, so that Electric's refusal to respond did not constitute an acceptance as between merchants pursuant to IC 26–1–2–207(2).

We cannot say the court erred in awarding consequential damages to Electric protecting it from the consequential damages found due from it to Midwestern. The evidence supports the judgment.

■ Eagle also argues that the court erred in failing to grant it pre-judgment interest on its judgment against Electric. That judgment was for $180,895.61, the amount of Eagle's claim.

A claimant on an open account or on a written contract for the purchase of goods is entitled to interest at 8% per annum for unreasonable delay in payment where no amount is specified by the parties. IC 24–4.6–1–102; *Sanderson v. Trump Mfg. Co.* (1913), 180 Ind. 197, 102 N.E. 2 (written contract); *Young v. Dickey* (1878), 63 Ind. 31 (open account).

In *Koppers Co., Inc. v. Inland Steel Co.* (1986), Ind.App., 498 N.E.2d 1247, 1256, *transfer denied,* we recently determined that the Indiana rule permits recovery of pre-judgment interest only upon the balance due where the other party (Electric) was entitled to an offset arising out of the same transaction.

Here Eagle asserts and Electric does not dispute that final payment was due thirty days after the last invoice date, or on October 24, 1982. It follows that Eagle was entitled to pre-judment interest at 8% per annum from October 24, 1982 until the date of judgment on the balance due Eagle from Electric in the amount of $36,695.61.

We therefore remand to the trial court to correct the judgment by awarding appropriate pre-judgment interest to Eagle on its claim against Electric. In all other respects the judgment is affirmed. Costs taxed three-fourths to Eagle and one-fourth to Electric.

HOFFMAN, J., concurs.

STATON, J., dissents and files separate opinion.

STATON, Judge, dissenting.

I respectfully dissent. The majority correctly frames the issue in terms of "whether the reference to 'standard terms and conditions of sale' contained in the order sent by Electric *must* be taken to mean Eagle's terms printed on the attachment to its letter of July 21st." (Maj. op. 970). My departure from their reasoning occurs when they conclude that the trial court was not "required to make any such interpretation." (*Id.*). The reference to "standard terms and conditions of sale" originated in the quotation sent to Electric by Eagle. To suggest Eagle was referring to any but its own terms and conditions is simply ludicrous. Even Electric never denied that the "standard terms and conditions of sale" were Eagle's terms; Electric merely denied they were made a part of the contract.

The majority speculates that the trial court "could properly have concluded that whatever the phrase 'standard terms and conditions of sale' was intended to mean, it clearly was *not* intended to negative the express agreement to protect Electric from consequential damage claims." (*Id.*) The intent relevant in contract matters is not some speculative intent, but rather the outward manifestation of intent. *Crabtree v. Lee* (1984), Ind.App., 469 N.E.2d 476, 479. We look to the manifestations of both parties' intent in the clear language of the contract. Where the terms of a contract are clear, the court merely applies its provisions. *Scott v. Anderson Newspapers, Inc.* (1985), Ind.App., 477 N.E.2d 553, 559, *trans. denied.*

In the case before us, there was no room for the trial court to make any interpretations regarding the contract. The express language of the contract makes it clear that Eagle would assume responsibility for the liquidated damages assessed by ISHC but would not be liable for any other consequential damages. Indeed, Eagle is only

appealing the amount of consequential damages awarded to Electric in excess of the $52,000.00 liquidated damages assessed by ISHC. A trial court should not render a contract meaningless when its expressed terms convey a contrary meaning.

Furthermore, whether the trial court concluded that Electric's refusal to respond to Eagle's letter of July 21st did not constitute an acceptance is irrelevant to this case. Clearly, the conduct of the parties established a contract. Accordingly, pursuant to I.C. 26-1-2-207(3), "the terms of the particular contract consist of those terms on which the writings of the parties agree...." Electric incorporated Eagle's standard terms and conditions in its purchase order.

Obviously, the majority is influenced by the desire to reach an equitable result since Electric was merely serving as a middleman. However, in our quest for equitable results, we must not ignore the law.

As to pre-judgment interest, I would remand to the trial court to award interest upon the balance due, offset only by the $52,000.00 liquidated damages portion of Electric's counterclaim.