WELLINGTON R. BURT, Appellee, *vs.* THE GARDEN CITY
SAND COMPANY, Appellant.

*Opinion filed December 15, 1908—Rehearing denied Feb. 4, 1909.*

1. CONTRACTS—*a contract for sale of entire "output" construed.*
A contract whereby a cement company agrees to sell, and a sand
company agrees to buy, the entire output of the cement company's
plant for a year at a certain price per barrel, except 65,000 barrels
already sold, which was to be at a different price, is complied with
if all cement manufactured at the plant in excess of 65,000 barrels
is shipped to the vendee; and there is no implied condition that
the vendee shall receive all the cement which could reasonably be
produced by the plant if operated at its full capacity.

2. SAME—*when vendor may terminate contract.* If a cement
company, which has contracted to sell to a sand company the en-
tire output for a year from a certain plant, has shipped to the ven-
dee all the cement produced at the plant, the vendee has no right
to refuse to make a payment under the contract upon the ground
that the vendor's delay in filling orders has caused a loss to the
vendee, and upon the latter's refusal to make payment the vendor
may treat the contract as terminated, discontinue shipments and
sue for the balance due on cement already delivered.

3. SAME—*burden of proving breach of warranty is upon the de-
fendant.* In an action by a cement company to recover the bal-
ance due upon cement delivered to the defendant under a contract
warranting the cement to be of a certain quality, if the defendant
claims a set-off by reason of a breach of the warranty the burden
is upon the defendant to prove the breach of the warranty and that
damages have resulted to him from such breach.

4. SAME—*when warranty is complied with.* Where a contract
for the sale of cement at a certain price per barrel f. o. b. cars at
the vendor's plant warrants the cement to be of a certain quality, if
the cement is of that quality when shipped from the vendor's plant
the warranty is complied with, since the vendor is not an insurer
that the cement would retain its quality under all circumstances.

5. SAME—*when inability to obtain cars excuses liability.* Even
though a contract by a cement company for the sale of its year's
output f. o. b. cars at the company's plant may be construed as
requiring cement to be shipped as rapidly as ordered by the vendee,
yet the vendor is only required to make all reasonable efforts to
fill such orders, and if it is unable to procure the cars in which to
make the shipments it is relieved from liability for failing to fill
such orders promptly.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. EDWARD A. DICKER, Judge, presiding.

EDWIN C. CRAWFORD, for appellant.

HOYNE, O'CONNOR & IRWIN, for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This was an action in assumpsit, commenced on January 8, 1907, in the municipal court of Chicago, by the appellee, against the appellant, to recover for the value of certain cement sold and delivered by the appellee to the appellant. The jury returned a verdict for the appellee for the sum of $34,464.14, upon which verdict the municipal court rendered judgment, which judgment has been affirmed by the Appellate Court for the First District, and a further appeal has been prosecuted to this court.

The contract under which the cement was sold was in writing and bore date January 1, 1906, and provided that the party of the first part (the appellee) agreed to sell and the party of the second part (the appellant) agreed to buy the entire output of cement manufactured during the year 1906 by the party of the first part at his cement plant located at Bellevue, Michigan. The contract provided that cement purchased during the months of January and February should be paid for at $1.05 per barrel, in bulk, f. o. b. cars at Bellevue, except about 65,000 barrels already sold, which was to be delivered at once for one dollar per barrel, less a commission of eight per cent, and that cement purchased from March 1 to December 31, inclusive, was to be paid for at $1.08 per barrel, in bulk, f. o. b. cars at Bellevue, and that all cement shipped during any month was to be paid for on the 15th day of the second month following, and that the cement was to be of a quality that would pass

the specifications of the American Society of Civil Engineers and the board of local improvements of the city of Chicago. Shipments were made as follows: In January, 2475 barrels; February, 5195 barrels; March, 16,087½ barrels; April, 37,460 barrels; May, 40,466½ barrels; June, 20,084 barrels; July, 25,953 barrels; August, 21,-944 barrels; September, 18,995½ barrels, and October, 6844 barrels.

On October 15 there was due for cement shipped in August, $21,976.26, and shipments had been made in September to the amount of $20,670.29, which would be due November 15, and in October to the amount of $7000, which would be due December 15. The mill of appellee was new, and there had been serious delays in filling the orders of appellant for cement. On October 15, however, the appellee was behind in filling orders only 1500 barrels. On that day the appellant failed to make the payment due for the August shipments and wrote appellee the following letter: "We make no remittance to you to-day, as we are trying to ascertain where we stand on sales of your cement not filled on our orders by you. The losses will be very heavy to us, and will, in all likelihood, much exceed the amount we are owing you. Just as soon as we can do so we will send you a statement showing the loss to us from your failure to comply with your contract,"—to which the appellee replied upon the 22d of October, as follows: "We want to say to you that unless you pay us what is due on the cement shipped you on or before the 27th of this month we shall consider the contract annulled. Will you be kind enough to write us at Saginaw whether or not you intend to pay us and go on with the contract?" Shipments were continued by the appellee until October 27, after which, no payments having been made, he discontinued to make shipments, and the appellant thereafter gave no orders for shipments. The appellant filed a set-off for damages for the non-delivery of cement and for cement delivered claimed to

be of a grade inferior in quality to that specified in the contract, which equaled the amount of the appellee's claim, and it was stipulated on the trial that $50,832.31 worth of cement had been shipped by the appellee to the appellant in August, September and October, 1906, none of which had been paid for by appellant; that appellant had returned sacks, etc., to appellee to the amount of $16,735.29, and that there was due the appellee from appellant the sum of $34,317.48, with interest, subject to such set-off as appellant might prove, if any, and subject also to the appellant's further right to disprove the correctness of any item in appellee's claim.

The main controversy between the parties in this court arises over the proper construction of the words, "the entire output of cement manufactured during the year 1906 by the party of the first part at his cement plant located at Bellevue, Michigan," it being the contention of the appellant that the output of the plant was about 300,000 barrels per year if running at its full capacity, and that the appellee was bound to operate the plant to that extent and fill shipping orders to that amount or pay damages to it for a failure so to do; while it was the contention of the appellee that he did not bind himself by the contract to operate his plant for any length of time further than was necessary to enable him to make shipments of cement to the amount of 65,000 barrels,—in other words, that he had only agreed specifically to ship 65,000 barrels of cement and the overplus of the output of his plant, if any, and that if he shipped 65,000 barrels of cement and what further output of the plant there was, he had complied with his contract.

We have considered all the provisions of the contract entered into between the parties, which will be found set forth in full in the opinion of the Appellate Court, and we find no other provision thereof which throws any light upon the meaning of the words heretofore referred to. We are therefore of the opinion the controversy between the parties

must be determined from those words alone, from which we conclude if appellee shipped, after shipping the 65,000 barrels of cement specifically agreed to be shipped, whatever over-plus of cement was produced by the plant of the appellee up to October 15, he had complied with his contract and was not in default upon his contract upon that day, and that the appellant could not terminate the contract on that day or put the appellee in default, and that as the appellee had made such shipments and the appellant did not make payment of the amount due upon October 15 by October 27, in accordance with the letter of appellee of October 22, the appellee had the right to terminate the contract between the parties and recover in this suit the entire amount due for shipments of cement made in August, September and October. We therefore are of the opinion the trial court did not err in giving to the jury the following instruction on behalf of appellee:

"The court instructs the jury that the refusal on the part of the defendant to make payment on the 15th day of October, 1906, in accordance with the terms of the contract entered into by and between the parties, amounted to a breach of said contract on its part; and you are further instructed, as a matter of law, that such breach of the contract on its part entitled the plaintiff to refuse to make any further shipments of cement under said contract; and the court further instructs the jury that the plaintiff having elected to abandon the contract by reason of such breach on the part of the defendant on and after October 27, 1906, the jury should consider the contract as rightfully terminated on and after said last mentioned day."

It would seem clear that the output of the plant for the year 1906 was the cement manufactured at the plant during that year. The Century Dictionary defines "output" as "the quantity of material put out or produced within a specified time;" and Webster says it is "the amount of coal or ore put out from one or more mines, or the quan-

tity of material produced by or turned out from one or more furnaces or mills in a given time." If the appellant was not satisfied to take the output of the plant for the year 1906 but desired to bind the appellee to furnish a certain number of barrels of cement during that time, it should have specified in the contract the number of barrels of cement that were to be shipped by appellee upon its orders during that year. This it did not do. It was therefore entitled to only the output of the plant, whatever that might be, over and above the 65,000 barrels specifically agreed to be shipped.

It is urged, however, by the appellant, that it appears from the contract and extraneous facts and circumstances in evidence that the parties intended that the plant should be operated to its full capacity, and that the appellant should receive during the year what cement could reasonably be produced by the plant when run at its full capacity. The contract does not so state, and the court cannot import into the contract a provision which the parties have omitted therefrom. To do so would be to make a new contract for the parties. In *Maryland* v. *Baltimore and Ohio Railroad Co.* 22 Wall. 105, it is said: "It would * * * be inadmissible to deduce an implication of a promise, not from the contract itself, but from the extraneous fact that such a promise ought to have been exacted. Ordinarily a reference to what are called surrounding circumstances is allowed for the purpose of ascertaining the subject matter of a contract or for an explanation of the terms used,—not for the purpose of adding a new and distinct undertaking." And in *Knox* v. *Lee,* 12 Wall. 457: "There is a well recognized distinction between the expectation of the parties to a contract and the duty imposed by it. * * * Were it not so, the expectation of results would be always equivalent to a binding engagement that they should follow." And in *Aspdin* v. *Austin,* 5 Ad. & El. (N. S.) 671, the court said: "Where parties have entered into written en-

gagements, with express stipulations, it is manifestly not desirable to extend them by implication. The presumption is, that having expressed some they have expressed all the conditions by which they intend to be bound under the instrument. It is possible that each party to the present instrument may have contracted on the supposition that the business would, in fact, be carried on and the service in fact continued during the three years, and yet neither party might have been willing to bind themselves to that effect; and it is one thing for the court to effectuate the intention of the parties to the extent to which they may have, even imperfectly, expressed themselves, and another to add to the instrument all such covenants as upon full consideration the court may deem fitting for completing the intention of the parties, but which they, either purposely or unintentionally, have omitted. The former is but the application of a rule of construction to that which is written; the latter adds to the obligation by which the parties have bound themselves, and is, of course, quite unauthorized, as well as liable to great practical injustice in the application."

It is also claimed by the appellant that the trial court erred in giving to the jury the following instruction:

"The court instructs the jury that under the law of this State it is incumbent upon the party claiming damages by reason of a breach of warranty to prove such warranty, its breach, and that damages have resulted by reason of such breach of warranty; and in this case it is incumbent upon the defendant, before it is entitled to recover any damages by reason of its alleged breach of warranty in the failure of the plaintiff to ship cement of the quality guaranteed, that the defendant prove, by a preponderance of the evidence, that plaintiff warranted the cement in question, as claimed by the defendant, that the plaintiff has committed a breach thereof by delivering to the defendant, or on its order, cement of a quality inferior to that warranted, and that dam-

ages have resulted to the defendant by reason of the inferior quality, as claimed."

We think the foregoing instruction correctly stated the law as to where rested the burden of proof. If appellee delivered cement to the appellant or shipped it upon its order, and the appellant claimed that it was not up to the standard of the specifications of the American Society of Engineers and the board of local improvements of the city of Chicago, the burden rested upon it to show that fact. In *Morris* v. *Wibaux,* 159 Ill. 627, it was held that the burden of proof rested upon the purchaser of personal property to show that the quality of the property delivered was not up to the standard of the warranty. The court, on page 641, says: "Where the appellee delivers the identical thing sold and has performed his contract in that behalf, if the appellant alleges that it fails to possess the attributes it was warranted to possess he may so plead, and on that issue the burden would rest on him, the appellant." (See, also, *Maltman* v. *Williamson,* 69 Ill. 423.) The instruction was inaccurate in so far as it informed the jury that it was incumbent upon the appellant to prove the warranty, as the warranty arose upon a contract in writing, and the construction of the contract was for the court, and not for the jury. The jury, however, were not misled on that proposition, as the court, upon behalf of the appellant, instructed the jury that the legal effect of the contract introduced in evidence was a question of law for the determination of the court and not a question of fact for the determination of the jury. It was not denied that the appellee had warranted the cement to be of a quality which would pass the specifications of the American Society of Civil Engineers and of the board of local improvements of the city of Chicago.

The fifth instruction given on behalf of the appellee informed the jury if the cement delivered was of the quality specified by the contract when delivered at Bellevue, then the liability of the appellee regarding the quality of the ce-

ment ceased. We think this was correct, as the appellee was not an insurer that the cement would retain its qualities under all circumstances.

The jury were also instructed that if the appellee was unable to procure cars in which to ship cement, that fact would relieve him from liability for a failure to fill the shipping orders sent him by appellant. The view of the trial court was that the appellee was bound to use all reasonable effort to operate his plant for the entire year and to fill all shipping orders sent him by appellant. While we think the trial court was mistaken in its view of the law in this regard, still, if that were the law and the appellee was required to try his case upon the theory that it was, then the appellee was only required to make all reasonable effort to make shipments of cement upon the orders of appellant, and if he was unable to procure cars in which to make shipments he would be relieved from liability.

We think the jury were properly instructed as to the law of this case.

The appellant has urged other reasons as grounds of reversal, but we are of the opinion they are without force. When the appellant refused to make further payments on the contract on the 15th of October, the appellee had the right to terminate the contract, as he did, on the 27th of October. On that day the appellant had in its hands upwards of $50,000 worth of cement which had been delivered to it by the appellee and for which it had not paid, and the appellee was not required to go on after that date delivering cement to the appellant under the contract without receiving payment therefor. *Harber Bros. Co.* v. *Moffat Cycle Co.* 151 Ill. 84.

Finding no reversible error in this record the judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*