## XRAY GAS CO. et al. v. LONE STAR GAS CO.

### No. 1916.

Court of Civil Appeals of Texas. Eastland.

March 1, 1940.

Rehearing Denied April 19, 1940.

Levy & Evans, of Forth Worth, and Turner, Seaberry & Springer, of Eastland, for appellants.

Marshall Newcomb, of Dallas, and Conner & Conner, of Eastland, for appellee.

FUNDERBURK, Justice.

On January 29, 1929, W. T. Fulfer and E. D. Garner (and wives) executed an oil and gas lease on 290 acres of land in Eastland County to Snebold & White, by which it was declared that lessors "have granted, demised, leased and let, and by these presents do grant, lease and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of buildings, tanks, power stations and structures thereon, to produce, save and take care of said production, all that certain tract of land" (describing said 290 acre tract). The consideration was $1,450 cash, the agreement of lessee to pay lessor $4,350 from 7/32 of production after a producing well should be completed, and certain other covenants and agreements, including lessee's obligations: (1) to deliver to the credit of lessor ⅛ of the oil; (2) to pay lessor ⅛ of the proceeds derived from the sale of gas at the mouth of the well for gas from each well where gas only is found while used off the premises; and (3) to pay lessor for gas from any oil well and used off the premises, or for the manufacture of gasoline, at the rate of ⅛ of the proceeds derived from the sale of gas (or casing head gas) at the mouth of the well for the time during which such gas shall be used or sold.

The term of the lease, subject to other provisions for forfeiture or other termination, was for "three years from this date and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." One provision gave to each party the right of assignment.

Snebold & White (the lessee) after conveying to Hoffman &. Page a 1/16 of their interest, completed a well (the only well ever drilled) producing large quantities of gas only. On April 17, 1929, after the completion of the well, Snebold & White and Lone Star Gas Company entered into and acknowledged a contract as follows:

"This agreement, made and entered into by and between W. F. Snebold and G. A. White, hereinafter called Vendor (whether one or more) and Lone Star Gas Company, a corporation, hereinafter called vendee: witnesseth:

"1. That the vendor, in consideration of One Dollar ($1.00) in hand paid, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter set out, hereby sells and agrees to sell and deliver at the mouth of the wells, to vendee, and the vendee agrees to receive, in the usual conduct of its business, all of the merchantable gas, in its natural state, including all hydrocarbons therein contained, as produced, from all the wells now drilled, and which may hereafter be drilled, on the following described premises, during the term of the present leasehold thereon, or any renewal thereof, said premises being situated in Erath County, Texas, to-wit: (Description) in accordance with the terms and conditions herein named, reserving only sufficient gas for development and operation of said premises, and such other gas as the lessor is entitled to use under the terms of the lease.

"II. Vendor: hereby warrants the title to all the gas sold hereunder to vendee, vendor's right to sell the same, and that such gas is free from all liens and adverse claims. Vendee shall not be required to make any payments hereunder until the vendor shall have submitted abstract of title covering said leasehold premises showing good and marketable title in vendor, and that vendor has good right to sell said gas, all to the satisfaction of the attorneys of the vendee; provided, however, if the title of vendor is thereafter questioned or involved in litigation the vendee shall have the right to withhold payments (without interest) during the pendency of such litigation, or until the said title is freed from such question, or until vendor furnishes bond conditioned to save vendee harmless with surety acceptable to vendee; Vendor shall promptly pay all rentals and royalties which may accrue under the terms of the lease, or upon request of vendor to vendee, the vendee shall make such royalty payments in behalf of vendor and deduct the amount thereof from the money that may be due or become due vendor; vendor shall promptly furnish to vendee abstract of title to land and copy of lease; subject to the other provisions hereinafter set out, vendor agrees to install, or pay vendee the cost of and expense of installing, all drips or other devices that may be found necessary to separate any fluids from the gas so that such fluids may be kept from entering the pipe line of vendee; and agrees to keep wells in good condition and to arrange for vendee's connection, which so far as practicable, shall be as follows:

"Above casing shall be placed a gate not less than six inches in size; and above this, a nipple, and then an outlet tee; and above this a nipple and another gate not less than

six inches in size; and above that, nipple and reducer with ¼ inch connection and ¼ inch valve; from the outlet tee one outlet nipple, followed by an ell, nipple and gate not less than four inches in size, followed by a nipple to which vendee may connect; and the gates and fittings to be of proper working pressure for the closed in rock pressure of the wells.

"III. Vendee: Shall connect all wells to its lines within 60 days after completion; shall install, operate and keep in repair a standard type of meter or meters and all other necessary appurtenant equipment for the measuring of the gas to be sold and delivered hereunder; shall pay for the gas at the rate of 6¢ per one thousand cubic feet, or any higher prevailing market price paid by vendee for like gas in the same field, computed at a pressure basis of two pounds per square inch above 14.4 pounds absolute pressure, and at an assumed storage and flowing temperature of 60 F., payable by check mailed to vendor on or before the 25th day of each month for deliveries during the preceding calendar month; shall have an easement for installing, operating and maintaining equipment with right to remove same before or within a reasonable time after expiration of contract; shall further have the right to operate, inspect and test all wells; shall give vendor the right to access to meter or meters and meter charts and the right, upon request to vendee, to test and inspect same at any reasonable time; shall not be required to take gas except when delivered in commercial quantities, free from water or other fluid substances, and at pressures sufficient to enter its lines against varied working pressure therein, nor to connect with unprofitable wells, nor to continue connection with any well after it becomes unprofitable to vendee; but vendee will endeavor, so far as operating conditions will permit, to apportion gas taken from this field on the basis of capacity and rock pressure of wells, and to protect the interests of the vendor against drainage through offset wells.

"IV. Any other provisions herein to the contrary notwithstanding, it is expressly covenanted, agreed and understood that the vendee shall install, operate and maintain, subject to other provisions hereinafter set out, gasoline drips at the wells, and for all gasoline saved and marketed by vendee from such drips it shall pay therefor as a total consideration, including both the working interest and the royalty interest therein a sum equal to ¼ of the average price for Grade 'BB' natural gasoline, North Texas market, as quoted in Platt's Oilgram, during the calendar month in which marketed; provided, however, that the vendee shall be under no duty or obligation to install, to operate, or to maintain a gasoline drip, as aforesaid, at any well, when, to do so, at such particular well, would prove unprofitable to vendee. `

"Should Platt's Oilgram suspend publication, or cease to carry prices, the vendor and the vendee shall agree upon some other publication, and in the event of failure to agree, shall each select a representative, who shall select a third, and the decision of the majority of the three as to the publication shall govern.

"V. Vendor jointly and severally guarantees division and payment to the proper parties owning the gas rights and agrees to furnish receipts at any time upon request.

"VI. Neither the vendor nor the vendee shall be held responsible or liable in damages for the acts or conduct of the other.

"This contract is subject to all present and future valid orders, rules and regulations of any regulatory body of the state in which these premises are situated.

"No conveyance of [or] any instrument of vendor shall be binding upon vendee, until vendee has been furnished with written notice and a complete abstract of title including such conveyance.

"All of the covenants, stipulations, terms and conditions of this agreement shall extend to and be binding upon the respective heirs, legal representatives, successors and assigns of the parties hereto, and shall be covenants running with said land for the full term herein set forth."

On May 14, 1929, Snebold & White conveyed all their interest in said lease and contract to Xray Gas Company. Hoffman & Page, after ratifying said contract, thereby making same effective as to them and their assigns, on February 18, 1935 conveyed their 1/16 interest in the lease to G. A. Clements, who in turn, on September 1, 1935, conveyed 151/200 interest therein (effective from February 18, 1935) to O. D. Dillingham.

Xray Gas Company, O. D. Dillingham and G. A. Clements brought this suit against Lone Star Gas Company to recover damages for alleged breaches of said con-

tract. By amended pleadings W. T. Fulfer and E. D. Garner, lessors in said lease, came in as parties plaintiff.

In general, the theory of plaintiffs' asserted right of recovery was that the defendant by the provisions of said contract was under duty to accept delivery of, and pay for all of the merchantable gas which the well on said land was capable of producing, save only as restricted or restrained by rules of the Railroad Commission; that, effect being given to such rules, the defendant was under duty to receive and pay for 50 per cent of all merchantable gas which the well was capable of producing from April 1, 1931, to October 17, 1933; and thereafter 25 per cent thereof up to and including September 19, 1936; that the contract was breached by defendant's taking much less gas than that amount to the extent of about $44,150.94 worth, that being the amount sought to be recovered as damages.

An alternative theory was that if defendant's duty was not as so alleged, the defendant was under duty to receive and pay for such quantities of gas as could be produced by the well and received by the defendant, in the exercise of reasonable diligence, subject to the limitations aforesaid, prescribed by the rules and regulations of the Railroad Commission "and/or to receive such quantities of gas daily and monthly so that all of the gas which said well was capable of producing would be received under purchase contract within a reasonable time." (Quotation from appellants' brief.)

The alleged damages under the different theories were the same.

In lieu of an unqualified general denial the defendant denied "all and singular the allegations in plaintiffs' original petition [First Amended Original Petition] except insofar as the same may be hereinafter specifically admitted, modified or explained." Defendant denied that it had breached any covenants, obligations, terms or provisions of the contract, but alleged that "at no time from the execution of said contract to the filing of this suit did defendant take the gas from plaintiffs' well on the contract premises in the quantities and in the manner which plaintiffs allege defendant was required to take such gas, under the provisions of said contract of April 17, 1929."

In a non-jury trial judgment was rendered to the effect that plaintiffs take nothing; from which plaintiffs have appealed.

It was one of the conclusions of law of the honorable trial judge that the contract in question "is an executory contract for the sale of gas at the mouth of the well as personalty", and "does not effect a conveyance of the gas in place as realty." This, being challenged, presents the first question we shall consider.

We have heretofore rendered an opinion in this case, in lieu of which this opinion will be substituted, interpreting said contract to be an executed conveyance of gas in place, as land, and, therefore, not an executory contract for the sale of gas as personal property. The correctness of that conclusion is challenged by appellee's motion for rehearing on many grounds, among them that it is contrary to the intention of the parties, clearly expressed in the contract; and contrary to decisions cited.

It is true, we think, that the contract expresses no intention of the "Vendor" to convey to the "Vendee" the gas in place as, in itself, land. It is also true that a number of provisions of the contract can be given no effect, or must be given an effect different from their ordinary import, if it was the intention of the parties to convey the gas as land. There is perceived no inconsistency between any of the provisions and an intention to prescribe the terms and conditions of a sale and purchase of gas, after severance from the land, and, therefore, of course, as personal property.

However, the same may be said of the oil and gas lease by which Snebold & White acquired whatever right or title they had in or to the gas. A review of the provisions of the lease shows that no intention was therein *expressed* to grant, demise, lease or let the oil or gas, if any, as land, distinct from the land wherein same may have existed. The only expressed subject of the grant or lease was the land—the whole of it. The restricted purpose of the grant, or lease, of the land (aided by a few other provisions) must be looked to in order to discover an intention to except anything from the grant or lease of all the land. No intention is discoverable from the provisions of the lease to except some of the land but to exclude from such exception the oil and gas in place, in the ground. That element of the declared "sole and only purpose" of the grant, or lease, of all the land, namely, of "operating for oil and gas", involves the physical severance of those minerals from the land. Unless severed, the oil or gas could be of no conceivable use either

to the lessor or lessee. Since intention to transfer ownership of the oil and gas from lessor to lessee rests only in implication, if at all, what warrant can there be for saying that the grant or lease of land for the purpose of severing oil and gas therefrom implies a transfer of ownership of the oil and gas in place which, without severance, can be of no use; rather than for saying it implies a transfer of ownership of the oil and gas, after severance, which can then be of use both to lessee and lessors? The further element of such "sole and only purpose", to-wit: "of laying pipe lines and of buildings, tanks, power stations and structures thereon, to produce, save and take care of such production", undoubtedly evinces an intention of the parties that the lessee is to have an easement in the land to enable him to effect a physical severance of the oil and gas from the land; or, in other words, to enable him to convert a part of the substance of the land into personal property. Here again is wholly absent any implication of an intention that the lessee shall own the oil and gas before its severance from the land.

In Texas & P. Ry. Co. v. Durrett, 57 Tex. 48, the instrument there considered declared that "I, John Durrett, * * * do hereby bargain, sell, grant and convey unto said company the right of way through and over [the land] together with the use of the wood, timber, water, etc., pertaining to the land so granted and conveyed, to have and to hold the same for the uses and purposes aforesaid unto said company and its successors forever" etc. Of that instrument Judge Stayton said: "[it] in terms purports to convey a perpetual easement in the land (Junction R. R. Co. v. Ruggles, 7 Ohio St. 1), or a qualified determinable fee, liable only to be divested if the estate is used for purposes other than that contemplated by the conveyance." After declaring that the right purportedly conveyed, if considered merely as an easement was an interest in the land, further said that such right was, however, "more than an easement in the legal acceptation of that term; in addition to granting a mere easement, it attempts to give the right *to take something out of and from the soil,* which is known in the books as a profit a prendre—a right coupled with a profit. * * * 'The distinction [between a mere easement and profit a prendre] seems to be this: If the easement consists in a right of profit a prendre, such as taking soil, gravel, *minerals,* and the like, from another's land, it is so far of the character of an estate or interest in the land itself, that, if granted to one in gross, it is treated as an estate, and may therefore be one for life or inheritance.' " (Italics ours).

That decision necessarily implies a construction of the instrument there considered to the effect that it would not transfer ownership of "the wood, timber, water", etc., in place as land. By the approved definition of profit a prendre and the examples given the court expressed the view that what was true of wood, timber, water, etc., was also true of soil, gravel and minerals. Certainly the lease in the instant case no more implied a transfer of title to oil and gas as land than the instrument in that case transferred ownership of the wood, timber, water, etc., as land. Tiffany says: "A person may have a right to take minerals from another's land in the nature of a profit a prendre. Such right to take minerals from another's land must be carefully distinguished from an estate *in the minerals themselves* which * * * may be separated, for the purposes of ownership, from the surface of the ground. * * * A right to take oil or gas from land in which the person so entitled has no right of ownership is likewise, though not always expressly so stated, a right of profit a prendre. 'Under the usual oil and gas lease', it has been said, 'the owner-lessor transfers to his lessee his right to drill for and produce oil and other substances. The rights of the lessee present a clear case of a profit a prendre in gross, a right to remove *a part of the substance of the land.* And in such case, the lessee has an interest in the land in the nature of *an incorporeal hereditament."* Tiffany on Real Property, sec. 846 (Italics ours). Further, the same authority says: "A profit a prendre * * is the right of one to remove and appropriate for his own use some thing or things from the soil of another, or things growing in or attached to or existing on such other's land. * * * The distinguishing feature of profit a prendre is the right to appropriate and take from the land, charged with it, a part of the soil or product of it in which there is supposable value. Each right [easement or profit a prendre] requires the use of the land in which it exists, and to use is to possess. Each, therefore, involves possession, though the title and broader right of possession is in another. Each implies such estate in the land as may be necessary to enjoyment of the right. Each is *incorporeal real*

*property."* (Italics ours) Tiffany on Real Property, sec. 840. See also Bender v. Brooks, 103 Tex. 329, 127 S.W. 168, Ann. Cas.1913A, 559; Right of Way Oil Co. v. Gladys City Oil Co., 106 Tex. 94, 157 S.W. 737, 51 L.R.A.,N.S., 268.

The point we are now endeavoring to emphasize is that, conceding, provisionally, the much debated proposition that oil and gas in place may by deed (or other instrument performing the function of a deed) be capable of conveyance and ownership, as corporeal real property, separate from the ownership of the rest of the land, the lease through which the rights of all parties to this suit have come does not by its terms express or imply any intention to transfer ownership of oil and gas in place as corporeal real property. On the contrary, it expresses an intention to convey a right of profit a prendre in the land under the definition of that term, which, although an interest in the land, is an *incorporeal hereditament,* entitling the lessee to acquire ownership of the oil and gas by severing same from the land, thus converting these minerals into personal property. In other words, the interest in the land is not the interest in the oil and gas as in themselves land, but interest in land of which the oil and gas in place are parts of the land of another.

But, if this conclusion as to the nature and effect of the lease be wrong, and, to the contrary, it must be held to sever the oil and gas from the land in which they lie, and to vest ownership of same in Snebold & White as a determinable fee estate in the oil and gas as land, then each and every reason for such a construction of the lease is an equally forceful reason to require the conclusion that Snebold & White being the owners of the oil (if any) and gas, as land, under said lease, have by said contract, in turn, severed the oil from the gas and transferred ownership of the gas to the Lone Star Gas Company, retaining thereafter no right or interest in such gas either as land or personalty, other than the possibility of reverter and the right to be paid the covenanted consideration on the basis of 6¢ per thousand cubic feet of gas, etc. The lease does not *expressly* purport to convey oil or gas either as realty or personalty, corporeal or incorporeal. The contract does *expressly* purport to convey the gas. The *contract* conferred upon the "vendee" the exclusive right to all the merchantable gas which the lease was capable of producing for a term enduring possibly forever. From the time of the execution of the contract Snebold & White could not, without breach of the contract, either use or sell any of the gas to a third person. Certainly it would seem that if, before the contract, the gas was land owned by Snebold & White by determinable fee title, and upon execution of the contract they could neither use it nor sell it, the title to the gas as land, not having terminated, must have passed by the contract to Lone Star Gas Company.

It is, perhaps, needless to say that the basis of our original opinion was the historic decision in the case of Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566, and decisions following it, to the general effect that, regardless of the forms of so-called oil and gas leases, they are, in legal effect, deeds conveying the oil and gas in place as land. According to said decisions such instruments, by their execution, effect a severance of the oil and gas from the rest of the land wherein they lie, and vest said minerals as an estate in land, which may be a freehold estate of inheritance.

Following the Mid-Kansas case it was the early view that oil and gas leases conveyed *all* the oil and gas. Caruthers v. Leonard, Tex.Com.App., 254 S.W. 779. Later this view was modified to the extent that, if an instrument provided for delivery of a certain fraction or percent of the oil or gas after production to the lessor as royalty, such royalty provision constituted an exception from the grant of the oil and gas to the lessee and remained the corporeal real property of the lessor, thus constituting the lessor and lessee, in effect, tenants in common in the ownership of the oil and gas; their rights as such modified, of course, by the terms of the lease as a contract. The view was still affirmed, however, that if the royalty provisions obligated the lessee to pay a part of the *proceeds of the sale* of the minerals produced, or a specified sum of money, as royalty, such a provision did not constitute an exception from the grant of oil and gas. Hager v. Stakes, 116 Tex. 453, 294 S.W. 835 (contra Ehlinger v. Clark, 117 Tex. 547, 8 S.W. 2d 666, 668).

Prior to the decision in Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021, 1030, it was undoubtedly the Supreme Court's interpretation of the law that a royalty provision which obligated the lessee to pay a

part of the *proceeds* of oil or gas, or a specified *sum of money* based upon the number or character of wells, etc., did not evidence an interest in the land retained by the lessor. The taxable interests in land upon which there was an oil and gas lease were regarded as consisting solely (1) of the land less the oil and gas, plus the part of the oil and gas, if any, reserved as royalty, all taxable against the lessor, and (2) all the oil and gas, less exceptions, if any, effected by the reserved royalty, taxable against the lessee. Under that view all taxable interests in the land constituted corporeal real property. In Sheffield v. Hogg, supra, an important change of view was expressed; one of far-reaching implications. The question was presented whether royalty provisions, not requiring delivery to the lessor of a part of the oil or gas as royalty, but requiring payment of money (in that case ⅛th of the money realized from gas marketed, and $1 per ton for sulphur mined), constituted interests in land taxable against the lessor, or assigns. As already noticed under the prior decisions, such interests were not so taxable. It is plain to be seen that if such rights are interests in land, it is not because they consist of gas or sulphur excepted from the conveyance of gas and sulphur to the lessee. Such royalty provisions were held to be interests in land, not because they represented exceptions from the conveyance of minerals as land, but upon the very different theory that they represented rights to profits in land. On the question before the court it was immaterial, of course, whether the royalty provisions evidenced interests in land, as retained title by the lessor to a part of the land (minerals), excepted from the conveyance of land; or whether because it represented rights to profits from land as appurtenant to land not conveyed. The final conclusion was expressed thus: "Classify them [the royalty provisions] as you may, they are at least rights or privileges belonging or in some wise appertaining to real property."

Let us suppose the court having been reminded that rights or privileges belonging, or in some wise appertaining to land, when constituting interests in land, are *incorporeal,* and since the same thing cannot at once be both corporeal and incorporeal, had been called upon to say whether a royalty provision obligating the lessee to deliver to the lessor ⅛th of the oil produced, was corporeal real property (oil in the ground, excepted from the conveyance of oil as land); or was *incorporeal* real property (a right or privilege "belonging or in any wise appertaining to real property). That, of course, would have been a question not necessary to the decision of the question before the court; but if it had been presented, is it reasonable to believe the court would have said, in effect, that an obligation of a lessee to pay a lessor a part of the proceeds from the sale of minerals produced, or $1 per ton, would be a right or privilege belonging or appertaining to real property; but that an obligation to deliver ⅛th of the oil produced and saved would not be of the same nature,—a right or privilege appertaining to real property? That the one was incorporeal real property but that the other was not incorporeal, but corporeal, real property? It is plain there no longer exists any reason for a distinction. While the former view obtained there was necessarily a distinction. But the decision to the effect that an obligation of a lessee to pay the lessor money royalties or rentals is a right in the nature of an appurtenance to land, logically forbids further adherence to the former view. Such rights are too patently of the same class. They both pass without mention in a conveyance of the land. They are each precisely of the same nature as the familiar incorporeal interest in land consisting of a right to rents.

In Stephens County v. Mid-Kansas, supra [113 Tex. 160, 254 S.W. 291, 29 A. L.R. 566], the question for decision was "whether appellee [assignee of lessee] acquired * * * such interests * * * in land as were subject to separate taxation." The decision of that question was that "the appellee did acquire interests and estates in the lands which were subject to separate taxation." Sheffield v. Hogg, supra, is authority for the proposition that the same decision of the question would have been required whether the leases constituted conveyances of oil and gas as land or only evidence of rights of profit a prendre. The same is likewise true of all the tax cases in which there has been occasion to re-affirm, in substance, that all ordinary oil and gas leases constitute conveyances of oil and gas as land.

■ In Tennant v. Dunn, 130 Tex. 285, 110 S.W.2d 53, 55, a lessee owning a ⅞₀ths of a lease and "all rights thereunder

or incident thereto", for a consideration of $5,000 paid by Mrs. Dunn, purported to "bargain, sell, transfer, assign and convey all the right, title and interest [of lessee] insofar as it covers and only covers Twenty Five thousand dollars ($25,000) worth of oil at the market price thereof * * * out of and from five forty-eighths (5/48) of Seven Eighths (7/8) of the oil produced from said well [delivered] free of any charges and/or expenses of production or operations of said property to Mrs. Emma Louise Dunn * * * her heirs, successors and assigns." The court of civil appeals had held that this was a conveyance of the specified part and amount of the oil in place as land, just as in our original opinion in the present case we held that the contract herein involved conveyed the gas in place as land; unable to escape such conviction if the decisions cited were to be regarded as controlling. If the lessee in Tennant v. Dunn, supra, owned the oil in place as land, and if the vendor in this case owned the gas in place as land, such owner, in either case, could undoubtedly by deed, or any instrument performing the function of a deed, convey such land to another. It is submitted that this is a proposition so self-evident as not to be seriously debatable. To say that the owner of land having a freehold estate therein cannot convey it to another with or without conditions, limitations or covenants (subject, of course, to those, if any, with which the title may be already burdened), and thereby effect a transfer to another of such ownership as he has, is simply to contradict the fact of ownership. If the lessee owns oil and gas, or either, as land, then unquestionably his estate therein, in relation to the land wherein said minerals lie, is a dominant tenement, as to which the right of ingress and egress to and upon the land of the lessor (or assigns) is an appurtenant easement. Such easement constitutes a servitude upon the land of the lessor absolutely essential to any use whatever of the dominant tenement; the land of the lessor being the servient tenement. If the easement imposing such servitude were not expressed, it would exist anyway by implication. Of such an easement appurtenant to a dominant tenement, Tiffany says: "An appurtenant easement is an incorporeal right which is attached to and belongs with some greater or superior right, and is incapable of existence separate and apart therefrom. It is obvious that the easement, to be ap-

purtenant, must be attached to a dominant estate, and it can become legally attached only by unity of title in the same person to both the dominant estate and the easement claimed. Hence, such an easement is regarded as so closely annexed to the dominant tenement that it passes prima facie upon a conveyance of such tenement without express mention, and regardless of whether the conveyance refers to 'appurtenances.' Likewise a recovery in ejectment of the dominant tenement involves a recovery of an easement appurtenant thereto." 3 Tiffany on Real Property, sec. 761; Evans v. Ropte, 128 Tex. 75, 96 S.W.2d 973. We can, therefore, see no logical escape from the proposition that if the lessee in Tennant v. Dunn, supra, owned the oil in place as land, and the vendor in this case owned the gas in place as land, then such oil, in the one case, and gas in the other, was conveyed as land.

But, in the Dunn case, the Supreme Court said: "We do not agree with the conclusion expressed by the Court of Civil Appeals that the instrument under construction is a conveyance of part of the oil in place." One reason given for such different conclusion was "It does not purport to convey oil in place * * *." To that suggestion it may be answered that neither did the leases in the Mid-Kansas case, supra, nor does the lease in the instant case. They no more purport to convey oil and gas in place than does the instrument in the Dunn case. A further reason was "it gives the assignee or the grantee no dominion over the oil before production and no right to enter upon the land to produce it." This reason seems to overlook the fact that the "right to enter upon the land to produce it" exists as an easement not in the oil and gas as land, of course, but in the land (of another) in which the oil and gas lie. Such easement, when expressed, exists precisely the same whether the title to the oil and gas passes as land, or is acquired by severance of same from the land as personal property. The only difference is that if ownership of the oil and gas is transferred as land, then, as already seen, the easement, whether mentioned or not, will pass as an appurtenant right; but if ownership of the oil and gas is not transferred as land, then the easement in the land of the lessor is not an appurtenance to land (there being no other land for it to be appurtenant to),

but is simply an encumbrance upon the land of the lessor, of which the oil and gas therein, if any, are a part. As to the instruments giving the grantee "no dominion over the oil before production" it may just as truly be said that it gives the same dominion which it was pointed out in the Mid-Kansas case that the instruments there considered, gave. There can certainly be no doubt that Mrs. Dunn could at once have conveyed to another the same rights she acquired by the instrument whatever their nature. If, as said in the Mid-Kansas case: "Dominion over a thing could not well be completer than it is in those persons who may, at their will, assign it ·to any other person, with or without consideration, for a time which may be forever", then Mrs. Dunn had all the dominion over the oil that her grantor had. The incontrovertible fact is that neither the lessor nor the lessee can have any *real* dominion over oil and gas in place in the land as distinct from dominion (limited or unlimited) over the land in which the oil and gas may lie. The owner of the land may by virtue of the dominion over his own land drill wells thereon, and by separating the oil or gas from the land, thereby converting same into personal property, acquire a dominion over the oil and gas distinct from his dominion over the land. Can the owner of the land confer any greater right or power upon another? It is submitted that it is impossible for the owner of land to transfer to another any actual dominion over oil and gas in place in his land as distinct from the transfer of dominion (to some extent) over the part of the land which is not oil or gas—the dominion imposed by virtue of a right of easement, without which the oil or gas, if any, can in no event be of any use or value. Further, if the sole dominion over the oil or gas in the ground consists of the right to convey same to another, would not that necessarily contemplate the conveyance of something of value? What then would be the effect of an attempted conveyance of oil or gas in place, as land, with an express withholding and denial of any easement in any other land, than the oil or gas, necessary to enable the grantee to take the minerals from the ground? Can it be said with any semblance of reason that the grantee in any such case would by merely attempting to reconvey the minerals to another, so stripped of the essential easement, be thereby exercising any real

dominion over same? To our minds the logical conclusion is that the only actual dominion involved is the dominion (restricted or unrestricted) over the land of another essential to the acquisition of any separate dominion over the oil or gas.

■ In Tennant v. Dunn, supra, the court, after expressing the conclusion that the instrument did not convey the oil in place as land, further said that "it does not follow, however, that the instrument does not create an interest in land." This is certainly a most significant declaration. It is undoubtedly supported both by sound reason and the great number of authorities cited. We accept it as a premise upon which we reach the conclusions hereinafter announced.

Such an interest in land appears clearly identifiable as an easement in gross in the land of the lessor (or assigns) in favor of the lessee, and, therefore, not an appurtenance to any other land, as manifestly it would be, if the oil under the ground be itself land of the lessee, served by the easement in the land of the lessor—thus constituting the lessee's land (the oil), the dominant tenement, and the lessor's land the servient tenement. The only consistent conclusion possible is as previous quotations from Tiffany and Texas & P. Ry. Co. v. Durrett, supra, show may be the case, that the rights of the lessee constitute an easement in gross in the land of the lessor, a good example of which is a right of profit a prendre whatever it may be called.

■ We have concluded that the decision in Tennant v. Dunn, supra, holding that the instruments there considered did not convey the oil as land, considered together with other cases, a discussion of which we must forego, but which include Martin v. Amis, Tex.Com.App., 288 S.W. 431; Dreeben v. Whitehurst, Tex.Com. App., 68 S.W.2d 1025; Houston Oil Co. v. Boykin, 109 Tex. 276, 206 S.W. 815; as reaffirmed in Jones v. Gibbs, 133 Tex. 627, 130 S.W.2d 265, 131 S.W.2d 957, and Dority v. Dority, 96 Tex. 215, 71 S.W. 950, 60 L.R.A. 941, justify the conclusion that, notwithstanding our opinion that if the lease conveyed the gas as land, so also did the contract, yet said contract should be interpreted as providing for the sale and delivery of the gas "at the mouth of the wells" as it says, and therefore necessarily as personal property.

It is realized that we could have announced our conclusions and confined the discussion to the decisions and authorities now deemed sufficient to justify them and have omitted a good part of the previous discussion, but had we done so would have been unable to escape the conviction that we were in justice due appellants a better explanation than that course would have afforded of our change of judgment, as also due the appellee, in justice to ourselves, a fuller statement by way of excuse, if not of reasons, for the previous opinion.

Regarding the subject matter of the contract as personal property in keeping with the foregoing conclusions, it appears that the "vendor" promised to sell and deliver gas and the vendee promised to accept delivery of, and pay for, the same gas. The contract, in its relation to the controversy in suit, may be regarded as within one or the other of two classes of contracts involving sales of personal property. For convenience, we may designate the two classes as (1) "Output contracts" and (2) "Requirement contracts."

Of the contracts we designate as "output contracts" Corpus Juris says: "A sale of the entire output of a certain article produced by the seller during a specified time binds the seller to deliver and the buyer to accept all that the seller produces." 55 C.J. 395, sec. 381. Examples of Texas cases dealing with such contracts are Arcola Sugar Mills Co. v. Farmer Hamlett's Co., Tex.Civ.App., 220 S.W. 385; Loeb v. Winnsboro Cotton Oil Co., Tex.Civ.App., 93 S.W. 515; Texas Farm Bureau Ass'n v. Stovall, 113 Tex. 273, 253 S.W. 1101. Examples of cases in other jurisdictions are Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622; Burt v. Garden City Sand Co., 237 Ill. 473, 86 N.E. 1055.

Of the contracts we have designated as "requirement contracts", Corpus Juris says: "Under a contract to sell all the goods of a certain kind the buyer may require, the seller is bound absolutely to deliver all the goods called for by the buyer within the limits of his requirements and the buyer is bound to accept all deliveries tendered within such limits, and whether the agreement constitutes a 'requirement' contract is a question of construction." 55 C.J. p. 393, sec. 380. Examples of Texas cases dealing with such contracts are Gulf Refining Co. v. Pegues Mercantile Co., Tex. Civ.App., 164 S.W. 1113; Cullinan v. Standard Power & Light Co., Tex.Civ.

App., 65 S.W. 689; Moore v. Paris Oil & Cotton Co., 9 Tex.Civ.App. 27, 29 S.W. 821.

It is believed to be a not inaccurate statement of appellants' contended construction of the contract that it is an "output" contract; and, of appellee's that it is a "requirement" contract; or, at any rate, particularly as to the latter, so nearly such that the same principles of law and authorities would be applicable. Appellants contend that it was the duty of appellee to accept delivery of all the gas the well was capable of producing, less only the amount restrained as the necessary consequence of compliance with orders of the Railroad Commission. If so, it is what we have called an "output contract"—the entire potential production (output) of gas, less the specified exception or exceptions. Appellee asserts the right to limit its acceptance of delivery of gas from all available sources to conform to its total requirements, the requirements limited and fixed by the market demand for its gas. If the contract is reasonably to be construed consistently with such asserted right, then in our opinion it is properly governed by the rules and principles applicable to "requirement contracts."

We may safely assume, we think, that if the contract is not a "requirement contract", then it is an "output contract." We may further assume that the contract is not a "requirement contract" unless that construction is justified by the phrase "in the usual conduct of its business", as appearing in the clause "and vendee agrees to receive in the usual conduct of its business all the merchantable gas", etc.

It may be remarked in the first place that in the absence of said phrase the vendee would not be obligated to accept delivery of, and pay for, all the gas the well was capable of producing. There were express exceptions from the general obligation. At the time of making the contract and as applicable to possible future conditions upon which, within the contemplation of the parties, the contract might operate, there was excepted from the general obligation to receive all the merchantable gas the following: (1) gas, if any, before connection of the pipe line with wells, not exceeding 60 days; (2) gas, if any, in less than commercial quantities, not taken for that reason; (3) gas, if any, not free from water or other fluid substance and not received for that reason; (4) gas, if any, not produced at pressures sufficient to enter ven-

dee's pipe lines "against varying working pressure therein." (5) Gas, if any, from unprofitable wells with which no connection had been made. (6) Gas, if any, from unprofitable wells after becoming so and connection therewith discontinued. (7) Gas not taken as the result of compliance with valid orders, rules and regulations of a state regulatory body. (We omit one or two other provisions, as not material to a proper decision, concerning which there are questions of more or less difficulty of whether they constitute exceptions or not). In addition to the exceptions named were the exceptions in the lease, binding upon the parties because they constituted covenants running with the land.

One way of stating the question at issue would be: Does the phrase, "in the usual conduct of its business", also provide an exception to the obligation of the vendee to "receive * * * all of the merchantable gas" etc., in addition to the other exceptions already noted?

Of the exceptions above listed, excluding the exceptions imposed by the terms of the lease, the only ones applicable to the existing conditions, possibly affecting the rights of the parties involved in the suit, are exceptions (4) — gas, if any, not produced at pressures sufficient to enter vendee's pipe lines "against varying working pressure therein", and (7) — gas not taken as the result of compliance with Railroad Commission rules or orders. Appellants in their petition took notice of the latter and excluded it from the amount claimed.

Let us now examine briefly the nature of the asserted rights of appellee which, if existing, as against the rights asserted by appellants, are referable to, and wholly dependent upon, said phrase "in the usual conduct of its business." Appellee, as said before, asserts, in effect, the right to restrict the total of all deliveries of gas to it from all available sources, including gas from the well in question, to the total market demand for its gas. It was shown by the evidence that its total potential supply of gas, in addition to gas from wells of its own, exists by virtue of contracts of varying nature and provisions. One class of such contracts, regardless of the potential production from the particular source of supply, obligated appellee to take a minimum of gas from a particular well or field. Another class of the contracts obligated it to take all the gas from a particular source without reference to the potential supply

from such source. Appellee further claims the right—as shown by an admitted practice—to appropriate to its total market demand from its receipts of gas from all sources ten million cubic feet per annum from each well capable of producing that amount; the total production from wells producing less than that amount; and a relatively larger proportion of the potential production of certain wells, as for example, wells producing water with the gas, etc.

We cannot escape the conviction that if such right exists as against the vendor's rights under the contract in suit, then the contract does not limit the scope or effect of such rights of the vendee. The appellee may, in the exercise of such rights, drill sufficient wells of its own to supply its total market demand for years, or indefinitely; may make enough contracts to take a minimum amount of gas from particular wells or the total residue gas from casing head gasoline plants, or may connect with a sufficient number of wells producing only ten million cubic feet per annum, or less, to supply from one or more, or all such sources alone, the full market demand for its gas. If, therefore, the right of appellee exists to refuse deliveries to it of any gas, save only enough to supply the total market demand, and it has the right to supply such demand from one or more of the sources above stated, the conclusion seems irresistible that appellee would have the right to accept no deliveries of gas from the particular well here involved, so long as conditions, controllable at the will of appellee, continue to exist. A construction of the phrase under consideration as giving the appellee the rights so asserted, would, in our opinion, destroy the contract for want of mutuality. The practical working effect of the contract would be that it gave appellee a continuing option to take and pay for only so much gas as it willed to take. The construction of the phrase "in the usual conduct of its business" contended for by appellee is, in effect, that the parties thereby adopted certain customs and practices of appellee known alike to the contracting parties, thereby making such customs and practices provisions of the contract. One answer to that contention is that the existence and knowledge of customs or practices cannot imply the inclusion thereof as parts of a contract contrary to the expressed provisions of the contract, nor contrary to the exclusions from the contract implied by the expressed provisions In short, if a con-

tract in general terms states the subject matter of the contract and obligations of a party with reference thereto with express exceptions from such subject matter, no custom or practice, however well-known to the parties, can be implied which has the effect of an additional exception to those expressed. Whatever the intended meaning of the phrase in question it may, we think, be confidently asserted that it did not incorporate into the contract a custom, usage or practice of the appellee having the effect of adding an exception to those expressed from the obligation of appellee to accept delivery of gas.

It is earnestly argued in support of appellee's construction of the contract that it could not have procured its necessary potential supply of gas as a reserve supply under contracts with the same or similar provisions, if the contract in suit be otherwise construed. There can be no doubt, we think, of the power of appellee, subject to the rules and regulations of the Railroad Commission and laws of this State, to make contracts, as the evidence shows it had done, obligating itself to make payments for purchased gas based upon a minimum take, or even the total production of wells, or to take more or less of the potential production under particular conditions or contingencies. Of course, it goes without saying, that as a matter of business policy, it would be necessary for appellee in making a particular contract to take into consideration its already existing contract obligations and to protect itself accordingly. It may be freely granted that as a business proposition appellee could not afford to obligate itself to accept and pay for deliveries of gas from all sources greatly in excess of the market demand. It does not follow, however, that appellee may not estimate the minimum market demand and within such estimate make a binding contract to take all or a definite part of the potential production of a particular well or field. In this view, the rights of the parties are to be determined from the contract.

■ Another reason why we think the appellee's construction of the phrase in question must be rejected is that no consistent or uniform custom or practice was shown to exist. The only uniform custom or practice in the conduct of appellee's business, which the evidence seems sufficient to show, was the custom or practice of general fair dealing with those supplying gas, without reference to contract obligations. The usual conduct of appellee's business, as shown by the evidence, had all the variations above discussed as asserted rights of appellee. It is not a question, we think, whether appellee has dealt generously or fairly with appellants. It is manifest that upon that ground, considered apart from the contract, appellants have no cause for complaint. The question is one of the existence of contract rights, to be determined, if possible, from the provisions of the contract. It is our conclusion that the contract may not be construed as a "requirement contract"; that it falls within said other classification.

A number of the findings of fact and conclusions of law upon which the judgment was based are, in effect, to the contrary, which being duly challenged require a reversal of the judgment.

Appellants' allegations of their cause of action as we construe them, are to the effect that not only all the gas which appellee was under duty to receive was duly tendered, but that same was actually delivered. Consistent with this theory, the contract price of the gas was sought to be recovered, after allowing credit, of course, for the amounts received.

■ Mr. Williston says: "If the reason why the property in the goods has not passed to the buyer is because the buyer wrongfully refused to take title when offered to him, according to the weight of authority, perhaps, in this country, the seller may recover the full purchase price." Williston on Contracts, sec. 1365. Texas cases cited are Ogburn-Dalchau Lumber Co. v. Taylor, 59 Tex.Civ.App. 442, 126 S.W. 48; Leventhal v. Hollamon, Tex. Civ.App., 165 S.W. 6. The law, as interpreted by the Texas courts, in Welden v. Texas Continental Meat Co., 65 Tex. 487 and Waples v. Overaker, 77 Tex. 7, 13 S. W. 527, 19 Am.St.Rep. 727, being of the earlier cases, is well stated by Tex.Jur. thus: "So where the buyer has wrongfully refused to accept delivery, the seller has a choice of remedies: he may hold the goods as the property of the buyer and sue for the price; or he may sell them at a fair sale and sue for the deficiency; or, he may treat them as his own and sue for the difference between the contract price and the market value on the date fixed for delivery." 37 Tex.Jur. 601, sec. 272.

These remedies are not concurrent but inconsistent. Ogburn-Dalchau Lumber Co. v. Taylor, supra; 37 Tex.Jur. 603, sec. 273.

As said in the case cited [59 Tex.Civ.App. 442, 126 S.W. 51]: "When the contingency arises—that is, when the contract is broken, the seller, having the choice of the remedies which the law gives him, is put to an election." Further in the same opinion it is said: "Of those mentioned above, the first involves a continued recognition of the title of the vendee in the undelivered goods, is a demand by the seller for the entire unpaid purchase price, *and not a claim for damages for a refusal to perform the contract.* The second and third are consistent only with claims for damages to be measured, not by the contract price alone, but by the difference between that price and the value of the undelivered goods. * * * If the seller elects to treat the property as still belonging to the vendee, and seeks to recover the entire contract price, *he must hold all the property in readiness to be delivered to the owner upon a demand accompanied by full payment of what is due.* * * * He cannot hold the latter liable for the full amount of the price for which the goods were sold *and then deprive him of all, or any portion of the goods.*" (Italics ours) The subject matter of the contract in suit is such we think that there could be no delivery of gas in the absence of acceptance of delivery. The gas which is the subject of controversy is undelivered gas. If plaintiffs' pleadings may be considered to be sufficient to support recovery upon proof of the contract price of the gas then the cause of action in its true nature is one for the specific performance of the contract. Municipal Gas Co. v. Lone Star Gas Co., Tex.Civ.App., 259 S.W. 684; Texas Farm Bureau v. Stovall, supra. The pleadings must have the effect of tendering to the defendant all the gas for which payment is exacted by the judgment without further payment.

If it be assumed that the evidence was sufficient to show the amount and price of the gas for which appellee was liable, the pleadings, it is believed, were not in such condition as to authorize the proper judgment in respect to these matters. We are, therefore, unable to render judgment, but conclude that the cause should be remanded for further proceedings. The effect of our revised conclusions is to require the several motions for rehearing to be overruled. This is done, but in order to prevent prejudice or inconvenience to the parties, our former judgment is set aside and re-entered in accordance with this opinion. It is accordingly so ordered.

## On Rehearing.

In the original opinion there is listed as exceptions from the general obligation of the vendee to take all the merchantable gas certain items designated "(1)" to "(7)", inclusive, supplemented parenthetically with the statement that "We omit one or two other provisions, as not material to a proper decision, concerning which there are questions of more or less difficulty of whether they constitute exceptions or not." The exceptions thus referred to exist, if at all, as the result of the following provisions of the contract, to-wit: "Vendee: shall connect all wells to its lines within 60 days after completion * * * shall not be required to take gas except when delivered in commercial quantities, free from water or other fluid substances and at pressures sufficient to enter its lines against varied working pressure therein, nor to connect with unprofitable wells, nor to continue connection with any well after it becomes unprofitable to vendee; but vendee will endeavor so far as operating conditions will permit, to apportion gas taken from this field on the basis of capacity and rock pressure of wells, and to protect the interests of the vendor against drainage through offset wells * * *.

"This contract is subject to all present and future valid orders, rules and regulations of any regulatory body of the State in which these premises are situated."

The parenthetical statement had reference to the clause: "but vendee will endeavor, so far as operating conditions will permit, to apportion gas taken from this field on the basis of capacity and rock pressure of wells and to protect the interests of the vendor against drainage through offset wells."

This clause, up to this time, has seemed to us to defy any reasonable interpretation consistent with other parts of the contract. In a previous motion for rehearing, appellants made an able argument on the question of its proper construction which, while not entirely convincing, did at least shake our previous conviction that the proration provision was an exception, like the others, from the obligation of the vendee to take all the gas. It was our view, however, that

the matter was not of controlling importance. Upon further consideration of the question we have concluded that appellants' suggested construction of the clause is not wholly unreasonable, and is necessary to avoid conflict with other provisions, and, at the same time, permit of some effect being given to that part of the clause referring to protection from drainage.

This conclusion necessarily ascribes to the language a different meaning and purpose and renders our former statement enumerating "exceptions" inaccurate.

The clause beginning "but vendee will endeavor" does not, according to appellants' construction, which we have now come to adopt, refer to vendee's general obligation to take all the gas, but only refers to the preceding clause (or a part or parts of same) beginning "shall not be required to take gas except · * . * *." Considering the provisions of the last named clause as in the nature of exceptions from the obligation of vendee to take all the gas, we must consider said succeeding clause—"but vendee will endeavor", etc.—as providing, in effect, exceptions to such · exceptions. Under this view it must be held to have been contemplated by the parties to the contract that · possibly ' there would exist "operating conditions" which would permit vendee to take gas not "delivered in [ordinarily] commercial quantities" and/or "free from water or other fluid substances" and/or "at pressures sufficient to enter its lines against varied working pressure ,therein" and/or "to connect with [ordinarily] unprofitable wells" and/or "to continue connection with any well 'after it becomes [ordinarily] unprofitable to vendee.' " It is unnecessary, however, that the said succeeding clause refer to all such contingencies. It may have meaning and be given effect if it refers to any of them.

We have heretofore assumed that said clause could not refer to and limit that part of the preceding clause reading "and at pressures sufficient to enter its lines against varied working pressure therein." It was assumed to be impossible (at least not within the contemplation of the parties) for the vendee to accept delivery of gas at pressures insufficient to enter the lines. It was, therefore, considered that said provision related only to a situation wherein there was such a temporary demand for high line pressure that the

rock pressure of the well would not force gas into the line. Upon that view it was the conclusion that this provision was an unqualified exception from the general obligation to take all the gas.

Appellants now make the point for the first time, although it may be thought that such idea was implied, or intended to be implied, in appellants' original brief or first motion for rehearing, that, according to evidence in the record, appellee did sometimes take gas at pressures which would not force the gas into its lines, accomplishing such result by applying mechanical suction to the wells. This, perhaps, should have occurred to us without specific mention, but the truth is that it did not. That fact is important in our revised conclusions. Its recognition permits the line pressure provision to be given a different meaning than the one heretofore ascribed to it. Instead of being an unqualified exception, its true nature is that of a conditional or qualified exception. If it be so regarded, then meaning and effect may be given to the "but vendee will endeavor" clause as one for the benefit of the vendor which unquestionably it purports to be.

Without argumentative amplification we think the last named clause operates to limit the effect of the circumstances enumerated in the preceding clause to the extent that notwithstanding the existence of such circumstances, or anyone or more of them, the vendee is under duty to continue to take gas "so far as operating conditions will permit", by good faith endeavor, in order to protect the interests of vendor against drainage through offset wells, or to effect a further recovery of gas, apportioned to the recovery from other wells in the same field based upon "capacity and rock pressure of wells."

In the original opinion it was our conclusion that of the exceptions listed as aforesaid, "the only ones applicable to the existing conditions, possibly affecting the rights of the parties involved in the suit are exceptions (4) —gas, if any, not produced at pressures sufficient to enter vendee's pipe lines 'against varying working pressure therein' and (7)—gas not taken as the result of compliance with Railroad Commission rules ,or orders. Appellants in their petition took notice of the latter and excluded it from the amount claimed." That statement must now be revised to omit "(4)—gas, if any, not produced at

pressures sufficient to enter vendee's pipe lines", etc., since under the uncontroverted evidence none of the circumstances ever existed permitting the operation of that provision.

█ We must next give attention to appellants' contention to the effect that, granting vendor's interest in the gas constituting the subject matter of the contract, was a right of profit a prendre, the contract constituted a transfer or conveyance of such right to the vendee with the result that the vendor's rights and remedies therein are not governed by the principles relating to ordinary contracts for the sale of personal property. Appellants have argued most convincingly that specific performance of the contract is impossible, Such impossibility of performance results from a combination of circumstances: that the well is one of about thirty in the same field, and, therefore, subject to drainage; and, if the vendee now begins full performance of the contract the limitations upon the amount of gas which may lawfully be taken under rules of the Railroad Commission, will leave the vendor without remedy for damages previously suffered. In other words, the difference between the amount of gas which the vendee has taken and paid for, and the amount which under 'the contract it should have taken and paid for up to the time full performance may be begun under a decree of specific performance, can never be made up since the decree of specific performance will require the vendee to take all the gas which under the rules of the Railroad Commission it can lawfully take without regard to past deficiencies in the amount taken. We see no answer to this argument and are forced to concede that our former views as expressed in the original opinion upon this point are untenable.

If the conclusion is correct that the contract is one for the sale of gas at the mouth of the well as personal property it does not follow that the contract is only that. The obligation it imposed upon the vendee to take the gas was at the same time the means by which the vendor exercised the right of profit a prendre. Only by vendee's discharge of its obligation to take the gas could the vendor discharge its obligation to the lessor to proceed with the severance of the gas from the land to their contemplated mutual profit. Unlike the usual contract for the sale of personal property, title was not in the vendor, but

vendor having the means of acquiring such title passed that means onto the vendee as an obligation of the latter to use it. The well having been drilled, gas discovered, and vendee's connection with the well arranged for, the performance of the vendee's obligation to take the gas, as produced, at the mouth of the well, at the same time constituted performance for the vendor of the latter's obligation to sever the gas from the land of the lessor, thereby converting it into personal property.

The principles ordinarily governing contracts for the sale of personal property cannot apply for more than one reason. In the first place, the contract itself by its very existence and nature, destroyed the value, if any, of the gas to the vendor. Unless and until rid of the contract, vendor could not sell nor make any use of the gas which vendee had refused to take. In the next place, vendor had no title to the gas in place in the land sufficient to support recovery of the sale price thereof, as such, since its means for the acquisition of title was the performance by the vendee of its obligation to take the gas, as produced, at the mouth of the well. The ordinary contract for the sale of personal property contemplates that title is in the seller.

█ It is our conclusion that the vendor was entitled to recover damages, the proper measure of which was the sale price of the gas which the vendee was obligated to take, credited with the amount which was taken together with legal interest from the time it should have been taken.

The authorities believed to present the nearest analogy are those dealing with somewhat similar obligations, but differing in the fact that the obligation was implied rather than expressed, and involving an inquiry into the question of reasonable diligence in the performance of the obligation rather than compliance with a performance expressly prescribed. Of such authorities may be mentioned the following: Alabama Oil & Pipe Line Co. v. Sun Co., 99 Tex. 606, 92 S.W. 253; Texas Pac. Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W. 2d 1031, 60 A.L.R. 936; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890; Empire Gas & Fuel Co. v. Pendar, Tex.Civ. App., 244 S.W. 184.

We are not convinced, however, that the evidence established conclusively the proper amount for which judgment should be rendered. Essential evidence consisted of

the opinions of expert witnesses. We think such evidence only raised an issue of fact which was not determined, but which was required to be determined by the trial court.

It is, therefore, our conclusion that although the grounds of our decision are in some respects changed, the motions for rehearing should be overruled. It is accordingly so ordered.